Frederick D. **WILLIAMS**

v.

The **UNITED STATES.**
No. 219–68.

United States Court of Claims.

Dec. 11, 1970.

---

Philip J. Hirschkop, Alexandria, Va., attorney of record, for plaintiff.

James N. McCune, with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

Plaintiff, a former employee of the Internal Revenue Service, presents two claims to the court. The first is for back pay (from May 11, 1962 to October 14, 1962) for his removal from the IRS while serving a one year probationary period. The second claim is for an alleged unlawful discharge from his position as a GS–9 criminal investigator with the IRS on August 12, 1964. The government asserts three defenses: limitations on the first claim; laches on the second claim; and the Civil Service Commission Board of Appeals and Review decision on the second claim upholding plaintiff's removal.

### Count One

Plaintiff's first position with the IRS was in the Boston, Massachusetts, branch as a GS–7 criminal investigator, Alcohol and Tobacco Tax Division. It commenced May 15, 1961. On May 11, 1962,

four days before the expiration of his one year probationary period, he was notified that he would be discharged, on the ground that his continued employment was not in the best interest of the Service. Plaintiff did not utilize his right of appeal to the Civil Service Commission, but rather filed a complaint alleging racial discrimination with the President's Commission on Equal Employment Opportunities. He was subsequently reemployed by the IRS on October 14, 1962, and went to the Philadelphia, Pennsylvania, branch office. At the time of his reappointment, plaintiff agreed that he would serve another one year probationary period and that he would not receive back pay for the period from May 11 to October 11. Plaintiff also requested that no action be taken on his racial discrimination complaint.

█ Williams, as a probationary employee, was not entitled to the benefits of the Veterans' Preference Act. "From a casual reading of the Act, it can be seen that it applies only to preference eligibles who have completed their probationary period. * * * Hence, the only possible source of rights is in the regulations." Cohen v. United States, 384 F.2d 1001, 1002, 181 Ct.Cl. 400, 403–404 (1967). Therefore, the rights that plaintiff did have are found in the regulations, 5 C.F.R. §§ 315.804 and 806.

§ 315.804 Termination of probationers for unsatisfactory performance or conduct.

When an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, *consist of the agency's conclusions* as to the inadequacies of his performance or conduct. [Emphasis supplied.]

§ 315.806 Appeal rights to the Commission.

(a) *Right of appeal.* An employee is entitled to appeal to the Commission in writing from the agency's decision to terminate him under § 315.804 * * * only as provided in this section. The Commission's review does not include any matter except as provided in paragraphs (b) and (c) of this section.

(b.) *On discrimination.* An employee whose termination is subject to the provisions of § 315.804 * * * may appeal on the ground that the action taken was based on political reasons not required by statute, or resulted from discrimination because of sex or marital status, or from improper discrimination because of physical handicap. When an appeal is based on any of these grounds, the appellant shall submit an affidavit setting forth the facts and circumstances on which the appeal is based.

*     *     *     *     *     *

(d) *Time limits.* An employee may submit an appeal at any time after receipt of the notice of adverse decision, but not later than 15 calendar days after the termination has been effected. The Commission may extend the time limit in this paragraph when the appellant shows that he was not notified of the time limit and was not otherwise aware of it, or that he was prevented by circumstances beyond his control from appealing within the time limit.

██ The regulations state that the dismissal notice given a probationary employee "shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." This was complied with by the IRS in that plaintiff was informed that he was being dismissed because his continued employment was not in the best interest of the Service. Plaintiff's course of action should then have been to appeal his dismissal to the Commission within the 15 day limit set by the regulations. Having failed to do this, plain-

tiff failed to exhaust his administrative remedy, and his dismissal became final. We stated in Friedman v. United States, 310 F.2d 381, 387, 159 Ct.Cl. 1, 11 (1962) cert. denied, Lipp v. United States 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963), that "Where the statute [regulation] requires that a particular administrative remedy must be exhausted (*i. e.*, a mandatory remedy) * * * the claimant cannot bring suit until he has reasonably exhausted that remedy." In our present case, plaintiff had 15 days to take his appeal to the Commission, and at the expiration of this 15 days, his dismissal became finalized. Therefore, the latest date from which limitations could begin to run was May 26, 1962. This date was more than six years before this suit was filed on July 30, 1968. Consequently, Count I of plaintiff's petition is barred by the six year statute of limitations in this court, 28 U.S.C. § 2501 (1964).

■ Plaintiff argues that his complaint filed with the President's Commission on Equal Employment Opportunities was sufficient to toll the statute of limitations. His theory is incorrect. This remedy was merely permissive (as opposed to the mandatory remedy set out in the regulations). Limitations were "not deferred or tolled by such optional administrative consideration." *Friedman*, 310 F.2d at 388, at 11–12.

### Count Two

Plaintiff's second count involves his second discharge from the Service on August 12, 1964, less than two years after his reappointment, but at a time when he did have civil service rights. The facts surrounding his second discharge are as follows. On May 11, 1962, the following notice was sent to the plaintiff:

In accordance with Section 2.301(c) (1) of the Civil Service Regulations, this letter will serve to inform you that your separation, during probationary period, from this Service will be effected at the close of business on Friday, May 11, 1962, for the following reasons:

On Monday, April 23, 1962, you were served with a Summons and Complaint in which your wife, Mrs. Gloria E. Williams is listed as Plaintiff, and you as Defendant, in an action for divorce, Supreme Court, State of New York, County of the Bronx. As a result of this service upon you, an investigation of this matter was conducted by the Internal Revenue Service. The investigation has developed:

(1) that your wife, Mrs. Gloria E. Williams, is bringing suit for divorce on the grounds of Adultery;

(2) that the co-respondent in the divorce action is Mrs. Laura Alvarados;

(3) that, since on or about June 1, 1961, you have been living in the same household with Mrs. Laura Alvarados, in Apt. #4, at 25 Wyoming Street, Roxbury, Massachusetts;

(4) that Mr. Robert Gordon of the Maurice Gordon Company, 2026 Washington Street, Boston, owners of the property located at 25 Wyoming Street, Roxbury, Massachusetts, advised this Service that their records disclose that on June 1, 1961, Apt. #4, at 25 Wyoming Street, Roxbury, Massachusetts, was rented to and is occupied by Frederick D. Williams and Laura A. Williams, housewife;

(5) that several of the tenants at 25 Wyoming Street, Roxbury, Massachusetts, have stated to representatives of this Service that Mr. Williams occupies Apt. #4 with his wife and a young boy of approximately eight (8) years of age. One of these tenants identified you as a Treasury Department employee; and

(6) that the records of the Home Savings Bank, Tremont Street, Boston, Massachusetts, disclose

that savings account #526760 was opened on April 17, 1962 in the name of Frederick D. Williams and Laura A. Williams, 25 Wyoming Street, Roxbury, Massachusetts.

Accordingly, your continued employment is not considered to be in the best interest of the Internal Revenue Service.

Very truly yours,

[Plaintiff's Ex. 2]

D. W. BACON
Regional Commissioner

After this notice was served on plaintiff, he voluntarily signed and furnished an affidavit to the IRS dated May 9, 1962, which contained, among other statements, the following:

\* · \* \* \* \* \*

"On or about July, 1961, I secured an apartment in my name at 25 Wyoming Street, Boston 21, my present residence. I resided there along until about mid September when Mr. Alvarado and his wife Laura and their child arrived in Boston via bus. Using my private car, we would commute on week-ends that I didn't work to New York and bring up his and my household and personal effects. Since then we have bought other household goods in my name, since he is unemployed, and he has reimbursed me my share through his savings. This arrangement is still in effect, viz., sharing all expenses. To my knowledge, Mr. Alvarado has not been employed since residing in Massachusetts but has been seeking employment. The nature of my work dictates at times that I reside in other cities for extended periods. Through our arrangements, I feel secure in the fact that my personal effects are well protected. Hence, the arrangement has worked out to our mutual benefit and satisfaction. I have also maintained living quarters at 287 Kempton Street, New Bedford, Mass., and at the YMCA, Providence, Rhode Island, due to the nature of my work."

\* \* \* \* \* \*

"With respect to the living arrangements between Mr. Alvarado and myself, there is nothing unusual in such an arrangement, and, in fact, is quite common. Nothing but feelings of respect and friendship exist between Mr. Alvarado, his family and myself."

[Plaintiff's Ex. 5]

The record shows that the IRS relied on the truth of this affidavit in reappointing the plaintiff on October 11, 1962.[1] This was found to be the case by the Acting Regional Director of the CSC on plaintiff's appeal.[2] After plaintiff was reappointed as aforesaid, he resumed work in Boston and later in Philadelphia.

The IRS took no specific measures to investigate the truth of the charges contained in its letter of May 11, 1962 (quoted above), to the plaintiff nor the truth of the statements made by him in his affidavit of May 9, 1962, until sometime after January 14, 1964. After that date, the IRS obtained information definitely proving that plaintiff swore to falsehoods in his affidavit of May 9, 1962. For instance, in his affidavit, plaintiff stated that Carlos Alvarado and Laura Alvarado were husband and wife, but an investigation showed that they were brother and sister. Furthermore, the investigation revealed that on June 1, 1961, Apartment No. 4, 25 Wyoming Street, Roxbury, Massachusetts, was rented to plaintiff, Frederick D. Williams and Laura A. Williams, housewife, at a time when he was married to Gloria Williams. The records show that he and Gloria were divorced on March 20, 1963. It was also discovered that the records of Home Savings Bank, Tremont Street, Boston, Massachusetts, disclosed that savings account No. 526760 was opened on April 17, 1962,

1. See affidavit of Charles Grossman, Chief, Personnel Branch, Exhibit J., page 2, Administrative Record of Civil Service Commission on plaintiff's appeal.

2. See Findings of Civil Service Commission, Exhibit C, page 2 of the above-mentioned Administrative Record.

in the name of Frederick D. Williams or Laura A. Williams, 25 Wyoming Street, Roxbury, Massachusetts. Furthermore, the records of the Department of Health, Bureau of Records and Statistics, Borough of Manhattan, New York showed that Frederick Douglas Williams, II, born August 9, 1962, was the child of Frederick Douglas Williams (the plaintiff here), and Laura Alvarado. Also, the records of the Bureau of License, City Hall, Newark, New Jersey, showed that Frederick D. Williams and Laura Alvarado were married on April 13, 1963, in Newark, New Jersey, about eight months after their child was born.

The plaintiff was confronted with the foregoing facts and was asked questions regarding them by the IRS, but he refused to answer. Thereupon, the IRS preferred charges against him on June 22, 1964, for the purpose of removing him from his job in order to promote the efficiency of the service. There were four charges listed: (1) Failure to Respond to Questions in Matters of Official Interest; (2) Failure to Pay Personal Debts; (3) Making False Statements on an application for Federal employment and to an investigator; and (4) Unauthorized Use of Official Government and IRS fee paid envelopes. Plaintiff replied to these charges. On August 7, 1964, he was informed that Charges 1, 2, and 3 were sustained, and that his removal would be effective August 12, 1964. An appeal was filed with the Civil Service Commission's Regional Office, and a hearing was held, resulting in a decision that the removal was justified, and that the removal was not based on racial discrimination, as plaintiff had alleged. Plaintiff appealed to the Board of Appeals and Review, which concurred in the decision and sustained the removal. Plaintiff now asks this court to overturn the administrative decision on the grounds that it is arbitrary, capricious, not supported by substantial evidence and without foundation in law or fact. Plaintiff does not allege a violation of applicable regulations or procedural error in his discharge.

Charge 1 against plaintiff contained six specifications based on § 1941.71 of the "Rules of Conduct for Internal Revenue Service Employees," failure to respond to questions in matters of official interest as follows:

> When directed to do so by Inspection or other competent Treasury or Revenue Service authority, employees must testify or respond to questions in matters of official interest. Employees must give such testimony, or respond to questions, under oath when required or requested to do so.

The questions plaintiff refused to answer centered around the statements contained in his affidavit of May 9, 1962, regarding his living with Carlos Alvarado and his "wife" Laura, whether or not he was the father of Frederick Douglas Williams II shown by a birth certificate to have been born to Frederick Douglas Williams and Laura Alvarado on August 9, 1962; whether he knew that a divorce was granted to his wife, Gloria, on March 20, 1963, on grounds of adultery in an action naming Laura Alvarado as corespondent; who had advised him that Gloria's divorce action had been withdrawn and no further action was contemplated in New York; who completed the application for rental of apartment No. 4 at 25 Wyoming Street, Boston, Massachusetts, dated May 31, 1961, which plaintiff admitted bore his signature; and who drafted the affidavits of four persons named Alvarado, which plaintiff recognized and which he filed with the IRS in support of his application for reinstatement with IRS. The plaintiff refused to answer all of these questions, although he was directed to answer them by an officer of the IRS.

Charge 2 was based on "Rules of Conduct for Internal Revenue Service Employees," § 194.35, failure to pay debts:

> Employees who, without just cause, refuse or neglect to pay, or to make and adhere to satisfactory arrangements to pay or otherwise settle, valid personal debts and obligations may be subject to disciplinary action. Employees are expected to manage their private fi-

nancial affairs in a manner which will not cause embarrassment to the Service.

Eighteen specifications of outstanding debts were set forth, of which eleven were sustained by the Regional Civil Service Commission. Prior to plaintiff's reappointment with the IRS in October of 1962, he had agreed to liquidate all of these debts within a reasonable time. At the time of his 1964 discharge, he had failed to make a single payment on seven of the eleven debts, and had paid only a minuscule amount on some of the others.

Charge 3 lodged against plaintiff was based on "Rules of Conduct for Internal Revenue Service Employees," § 1942.55, involving false statements:

Proper functioning of the Revenue Service requires that the Service, the courts, other Federal agencies and the public be able to rely implicitly on the truthfulness of Revenue Service employees in matters of official interest. An employee may be subjected to severe disciplinary action and prosecution for intentionally making false or misleading verbal or written statements in matters of official interest. Some of these matters of official interest are: * * * application forms SF–57, and other forms, which serve as a basis for appointment, * * *; and affidavits, transcripts of testimony, or statements to Inspection, whether or not under oath.

Charge 3 contained three specifications as follows:

\* \* \* \* \* \*

*Specification 1*—In an affidavit executed by you on May 9, 1962, given to Assistant Regional Inspector Edward C. Pelletier, Internal Revenue Service, Boston, Mass., you stated that you had been residing since September 1961 at 25 Wyoming St., Boston, Mass., with Carlos Alvarado and his wife Laura, and their child; that there was nothing unusual in the arrangement, and that nothing but feelings of respect and friendship exist between Mr. Al-

varado, his family, and yourself, whereas, official public records show that Laura and Carlos Alvarado are brother and sister, and official public records as of June 18, 1963, show that on August 9, 1962, a male child, named Frederick Douglas Williams, II, was born to the mother, Laura Alvarado, age 25, and to the father, Frederick Douglas Williams, age 40, occupation, Criminal Investigator, U. S. Treasury Department.

*Specification 2*—On April 30, 1963, you executed and filed SF–57, Application for Federal Employment, with the Internal Revenue Service, Office of Regional Counsel, Philadelphia, Pa., for the position of Attorney. In Item No. 19, "Experience—1", you indicated you were employed by the U.S. Treasury Department, Alcohol Tax, 500 U.S. Customhouse, Philadelphia, Pa., from "May 1961 to present time", whereas your actual employment with the Treasury Department, Internal Revenue Service, Alcohol and Tobacco Tax Division, covered the periods from May 15, 1961 to May 11, 1962, at Boston, Mass.; from October 11, 1962 to October 13, 1962, at Boston, Mass., and from October 14, 1962 to present time, at Philadelphia, Pa.

*Specification 3*—On April 30, 1963, you executed and filed SF–57, Application for Federal Employment, with the Internal Revenue Service, Office of Regional Counsel, Philadelphia, Pa., for the position of Attorney. In Item No. 35, which read: "Have you ever been discharged (fired) from employment for any reason?", you checked the block indicating "No", whereas, official records show that you were separated from the Internal Revenue Service, Boston, Mass., on May 11, 1962, for disqualification during probation.

\* \* \* \* \* \*

Charge 4 accused plaintiff of unauthorized use of U.S. Government, Internal Revenue Service, official business envelopes, postage and fees paid. This charge was not sustained and will not be discussed further.

Charge 1 (Failure to Respond to Questions in Matters of Official Interest) and Specification 1 of Charge 3 (False Statements) are inextricably related to each other and will be considered together.

*Charge 1 (Failure to Respond to Questions In Matters of Official Interest) and Specification 1 of Charge 3 (False Statements)*

There is no question but what the plaintiff made false statements to the IRS in his affidavit of May 9, 1962. The facts in the record showing that at the time he was married to Gloria Williams he lived with an unmarried woman named Laura Alvarado in an apartment he rented in both their names and fathered her illegitimate son, and also maintained a bank account in both their names, plus the fact that Gloria divorced him on the ground of adultery, naming Laura Alvarado as corespondent, prove unmistakably that the statements in his affidavit of May 9, 1962, were untrue. He filed this affidavit with the IRS intending for it to rely on the truth of its contents. The IRS did rely on it in reappointing him on October 14, 1962. When the IRS later discovered that the affidavit contained false statements, such statements became matters of official interest as stated in Regulation 1942.55 quoted above. The IRS had a right to ask plaintiff about the statements in his affidavit as being matters of official interest and followed this procedure. The plaintiff refused to answer the questions. The plaintiff contends that the IRS had no right to ask him questions about his private life. We do not need to decide that question under the circumstances of this case. Here, the false statements were not made in answer to questions propounded by the IRS or anyone else. The plaintiff *voluntarily* signed and presented the affidavit with the false statements to the IRS of his own free will. It appears that he "intentionally" made false statements in matters of official interest in violation of Regulation 1942.55. Furthermore, he violated Regulation 1941.71 when he failed to answer questions in matters of official interest (the false statements) when directed by an officer of the IRS to answer them. These violations of the Regulations justified the IRS in dismissing him in order to promote the efficiency of the service. Mendelson v. Macy, 123 U.S.App.D.C. 43, 356 F.2d 796 (1966). *See also* Nelms v. United States, 167 Ct.Cl. 423 (1964), cert. denied, 381 U.S. 943, 85 S.Ct. 1781, 14 L.Ed.2d 706 (1965); Powers v. United States, 169 Ct.Cl. 626 (1965); and Bryson v. United States, 396 U.S. 64, 68–72, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969).

*Charge 2 (Failure to pay Personal Debts)*

Under this charge the plaintiff was accused of failing to pay his personal debts without just cause in violation of Regulation 1942.35 quoted above. This charge was sustained by the IRS and the CSC. We do not need to consider this question in view of our decision upholding plaintiff's dismissal on the charges last discussed above. However, we will say in passing that all government employees should pay their just debts when due to the best of their ability so as not to give their employers a bad reputation. McGuire v. United States, 145 Ct.Cl. 17 (1959). On the other hand, the government should not be a collection agency for the creditors of their employees.

*Charge 3—Specifications 2 and 3 (False Statements in Form SF–57)*

In Specification 2, Charge 3, the IRS charged that the plaintiff had made a false statement in an application for employment in the IRS on what is known as Form SF–57, dated April 30, 1963. The alleged false statement was that he was employed by the IRS in Philadelphia from "May 1961 to present time." The IRS alleged that the truth of the matter was that he was employed by the IRS at Boston from May 15, 1961, to May 11, 1962, and from October 11, 1962, to October 13, 1962, and was employed by the IRS at Philadelphia from October 14, 1962, to the present time. The plaintiff

contends that this was an unintentional error or mistake and was not done deliberately.

In Specification 3, Charge 3, the plaintiff was accused of having made another false statement on Form SF–57 in that he answered "no" to the question "Have you ever been discharged (fired) from employment for any reason?" The IRS charged that this was false because the records show that he was separated from the IRS at Boston, Massachusetts, on May 11, 1962, for disqualification during probation. Plaintiff contends that this was not a false statement nor an intentional misrepresentation, because he was "reinstated" on October 14, 1962, which in his mind erased and cancelled the discharge of May 11, 1962.

The IRS and the CSC sustained both Specifications (2 and 3) of Charge 3. We find it unnecessary to decide whether or not this action was correct since we have sustained plaintiff's dismissal for making false statements in his affidavit of May 9, 1962 (Specification 1, Charge 3) and for failure to answer questions in matters of official interest (Charge 1).

### Racial Discrimination

██ When the second charges were filed by the IRS against plaintiff on August 12, 1964, he, on the same date, charged racial discrimination as the basis for his removal. This charge was investigated and on December 4, 1964, Robert A. Wallace, Assistant Secretary of the Treasury and Employment Policy Officer informed the plaintiff that he had found no basis for the charge of racial discrimination as a cause for his removal. The IRS, the CSC and the Board of Appeals and Review all found that racial discrimination was not a causative factor in plaintiff's dismissal. We agree that this was a correct decision on this question.

### Laches

The government claims that plaintiff's claim is barred by laches. We do not find it necessary to reach this question.

### Conclusion

We hold that the administrative decision to discharge the plaintiff for making false statements and refusing to answer questions on matters of official interest in violation of the regulations of the IRS, as discussed above, was supported by substantial evidence and was neither arbitrary nor capricious.

The defendant's motion for summary judgment is granted and plaintiff's petition is dismissed.

NICHOLS, Judge (concurring in the result):

I concur in the result, but such concurrence is not to be understood as a tacit approval of this method of dealing with an unwanted employee. The entire proceeding, it seems to me, is tainted by the initial agency determination to discharge Mr. Williams for reasons which I consider to be unlawful. Mr. Williams' second separation was proposed on four charges. One may not be considered, as it was dropped. That was misuse of Treasury franked envelopes. Another could be considered, but practically need not be here. That is the failure to pay private debts. I would have some comment about the Government's constituting itself an ancillary collection agency for private debts owed by its employees, except that I do not wish to enact in dictum the role of sermonizer to the executive branch. The CSC indicates it sustains this charge, but in a half-hearted manner. It would not fire Mr. Williams on this ground alone, as I read the Regional Commissioner's report, for it is not one of those on which its decision is "specially" based. Then there is one charge, with three specifications, of misstatements on matters of official concern. Two of these are employment history statements on Form 57, failing to reflect accurately Mr. Williams' then recent employment with Treasury itself. He could not have expected that the Treasury would not consult its own official files for his employment history while with Treasury, which it would have had to do in any event. He could not

have expected to deceive anyone, therefore. These specifications are no more than makeweights.

The real gravamen of this case lies in the specifications that relate indirectly to Mr. Williams' private life. It seems that Mr. Williams set up in Boston, Massachusetts, a household that included himself, another man, and a woman. The Treasury suspected him of living in sin, and fired him. He riposted with charges of racial discrimination. After some months a compromise was made by which they reinstated him, but without back pay, and he withdrew the discrimination charge. I do not challenge the court's holding that recovery of the pay for this period is barred by limitations.

In course of opposing this first ouster he represented, in an affidavit, that the other man and the woman were a married couple. After reinstatement, the Treasury discovered actually they were brother and sister. Mr. Williams' previous wife was suing him for divorce, naming this woman as corespondent. She had a child born to her whom Mr. Williams acknowledged as his child. It cannot seriously be urged that the affidavit Mr. Williams furnished about his private life was true, and the later discovered falsity of it is the serious one among the specifications of false statements.

The other charge relates to Mr. Williams' refusals, on advice of counsel, to answer questions of Treasury agents, apparently framed to get him to admit the falsity of the above-mentioned statement.

Mr. Williams is a veteran and cannot be removed except to "promote the efficiency of the service." 5 U.S.C. § 7512 (a) (Supp. II, 1965–66). This language, I believe, was not until lately given much effect except as barring removal for such disapproved reasons as political affiliation. Anything believed by management in good faith to constitute misconduct was adequate. However, more recently some courts have, and I believe soundly, relied on this phrase to require some nexus with the interests of the service in cases of offduty misconduct. *See,* Norton v. Macy, 135 U.S.App.D.C. 214,

417 F.2d 1161, 1163–1164 (1969), but contrary to that case, this nexus one may suppose *arguendo* is furnished if the offduty misconduct is of a kind that many people, even in these permissive days, regard as so infamous that they mistrust a Government agency which retains the perpetrators on its payroll, to a degree to impede its performance of its lawful missions.

I do not think that a man's discreet extra-marital relations with a consenting adult female are anywhere now regarded as so infamous that they would reflect crippling discredit on an agency of Government which knowingly employed him, or her either. Thus the removal of Mr. Williams, on this ground, if persisted in, could not have stood up in court.

Mindel v. United States Civil Service Commission, 312 F.Supp. 485 (N.D.Cal. 1970), so holds in a well reasoned opinion. Besides *Norton, supra,* the court refers for authority to Pope v. Volpe, decision of Judge Howard Corcoran of the District of Columbia, dated February 5, 1970. I do not know how this decision came to the California Judge's knowledge, but have confirmed its actuality. The court in *Mindel* also cites Judge Learned Hand in Schmidt v. United States, 177 F.2d 450 (2d Cir. 1949), who holds that an alien admittedly guilty of this kind of misconduct cannot be barred from naturalization as not "of good moral character." Pelicone v. Hodges, 116 U.S.App.D.C. 32, 320 F.2d 754 (1963), appears to be along the same line as *Mindel,* with complications needless to enlarge upon here.

It would follow that plaintiff might properly refuse to answer questions about such relations. The charges recite that questions were on "matters of official interest" and if they were not properly so, no authority is referred to which shows why Mr. Williams had to answer them. Indeed, my culture group, those among whom I grew up, regarded it as infamous to give out derogatory information true or false, impugning the chastity of a woman. The only permissible response to queries along that line, if per-

sisted in, was a blow to the jaw. Mr. Williams may be that old-fashioned: at any rate, his sincere concern for the honor of this woman is shown by the fact that he married her and gave his name to her child.

When the only proper "service connection" in cases of off-duty misconduct is the possible disrepute to the agency, an illicit liaison which is decently concealed from view is less of an offense than one which is overt and flaunted, if it is one at all. The court in *Mindel, supra,* agrees. In this regard an agency which persists in ferreting out its employees' secret affairs may be said to be contributing to its own discredit. If the employee strives successfully to keep them secret, the agency's repute flourishes as well as his own.

The fact is that the "false statement" charge is a useful means of getting rid of unwanted Government employees, and is legitimate in its place. But Government investigators who can ask improper questions and obtain a discharge for false answers have every incentive to keep on asking such questions. Many employees will trap themselves responding to improper questions with improper answers, not being advised by counsel and knowing no better. I, therefore, believe that the only way to protect employees from improper questions, those the investigator has no right to ask is to treat false answers the same as refusals to answer. If this is too sweeping for some cases, it is valid where a true answer would enrich the Government files only with derogatory information about the private life of an innocent person, one in no way concerned with the investigation.

I repeat, that none of the above observations apply to cases where a nexus with service interests other than possible disrepute appears. Such a case I assume exists as to the incumbent of a "sensitive" position. Nothing said is intended to apply to any case except the one before the court, and in case of ambiguity should be so construed.

I believe, therefore, that Mr. Williams could have successfully challenged the first separation if he had gone about it in proper fashion, and then the second need not have occurred. To me the discharge notice of May 11, 1962, set forth in the majority opinion, proclaims its illegality on its own face. If Mr. Williams had answered investigators pressing him to admit these charges with false denials or evasions, I am not sure this would put him out of court. What I think we cannot condone is the affidavit, replete with false and fictitious particulars, which plaintiff concocted and submitted to obtain his reinstatement. I think an award of damages to Mr. Williams would be contrary to 28 U.S.C. § 2514. See my views how we should apply this statute as stated, concurring, in Eastern School v. United States, 381 F.2d 321, 438, 180 Ct.Cl. 676, 705 (1967). As to forfeiture of claims tainted by claimant's misconduct, compare generally United States v. Acme Process Equipment Co., 385 U.S. 138, 87 S.Ct. 350, 17 L Ed.2d 249 (1966). Consequently I would hold that the affidavit precludes Mr. Williams' recovery in this court regardless of what conclusion we might draw from a mere review, appellate in character, of the CSC proceedings. I reach this conclusion with one eye, too, on Bryson v. United States, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969), and United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969), which hold that a person can be prosecuted under 18 U.S.C. § 1001 for giving false information to a Government agency on a matter within its jurisdiction, even though it was information the agency could not have demanded. I would rely on these cases more heavily if I were satisfied Mr. Williams' private life was within IRS jurisdiction, but certainly they cannot go unmentioned. Mr. Justice Harlan's language (in *Bryson*) at p. 72, 90 S.Ct. at p. 360 is very sweeping:

> * * * it cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question which the Government should not have asked. Our legal system provides methods for challenging

the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.