Joseph **ACANFORA, III**, Appellant,

v.

**BOARD OF EDUCATION OF MONT-GOMERY COUNTY, et al.,**
Appellees.

No. 73-1788.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 6, 1973.

Decided Feb. 7, 1974.

---

Michael H. Gottesman, Washington, D. C. (George H. Cohen, Darryl J. Anderson, Dennis D. Clark, and Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., on brief), for appellant.

Robert S. Bourbon, Rockville, Md., for appellees.

Melvin L. Wulf, Marilyn G. Haft, New York City, and Elsbeth Bothe, Baltimore, Md., on brief, for American Civil Liberties Union, amicus curiae.

Stephen J. Pollak, John D. Aldock, David Rubin, Joel D. Gewirtz, and Shea & Gardner, Washington, D. C., on brief for National Education Association, Maryland State Education Association, and Montgomery County Education Association, amici curiae.

Before CLARK,[*] Associate Justice, BOREMAN, Senior Circuit Judge, and BUTZNER, Circuit Judge.

BUTZNER, Circuit Judge:

Joseph Acanfora III appeals from an order of the district court denying him reinstatement to a teaching position in Montgomery County, Maryland. The district court held that the school officials wrongfully transferred Acanfora to a nonteaching position when they discovered that he was a homosexual, but it denied relief because of Acanfora's subsequent press and television interviews. We hold that Acanfora's public statements were protected by the first amendment. We conclude, however, that he is not entitled to relief because of material omissions in his application for a teaching position. Consequently, without reaching Acanfora's claim that his denial of a teaching position is unconstitutional, we affirm the district court, but on different grounds.

I

While Acanfora was a junior at Penn State University he joined an organiza-

---

[*] Supreme Court of the United States, retired, sitting by designation.

tion known as the Homophiles of Penn State, which had as its purpose the development of public understanding about homosexuality. Acanfora not only attended Homophile meetings, but he served as the group's treasurer and joined other members in bringing a lawsuit that established it as an official university organization. His public acknowledgement of homosexuality ultimately led to his suspension from a student teaching assignment, but a state court promptly ordered that he be reinstated. When Acanfora applied for teacher certification, however, Penn State officials differed as to his qualifications and forwarded his application to the Pennsylvania Secretary of Education without recommendation.

In the meantime, Montgomery County school officials, unaware that Acanfora was a homosexual, employed him as a junior high school science teacher. They didn't learn of his homosexuality until several weeks after school opened in the fall, and only then as a result of a widely publicized press conference at which the Pennsylvania Secretary of Education announced favorable action on Acanfora's application for teacher certification in that state. Shortly after this disclosure, the Montgomery County deputy superintendent of schools transferred Acanfora, without reduction in pay, from teaching to administrative work in which he had no contact with pupils. When the school officials did not accede to Acanfora's demands that he be returned to his classroom assignment, he commenced this action.

## II

Following his transfer to an administrative position, Acanfora granted several press and television interviews. The district court characterized the television programs as tending to spark controversy, and noted an element of sensationalism in Acanfora's remarks. It held that Acanfora's appearances were not reasonably necessary for self-defense, but instead exhibited an indifference to the bounds of propriety governing the behavior of teachers. Conse-

quently, the court, ruling that the refusal to reinstate Acanfora or renew his contract was neither arbitrary nor capricious, dismissed his suit.

■ The Supreme Court has explained the general principles that govern the intricate balance between the rights of a teacher to speak as a citizen on public issues related to the schools and the importance the state properly attaches to the uninterrupted education of its youth. Balancing these interests, the Court has ruled that a teacher's comments on public issues concerning schools that are neither knowingly false nor made in reckless disregard of the truth afford no ground for dismissal when they do not impair the teacher's performance of his duties or interfere with the operation of the schools. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *Cf.* Johnson v. Branch, 364 F. 2d 177 (4th Cir. 1966), cert. denied 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967). Acanfora's public statements must be judged by these constitutional principles, and not, as the district court suggested, by the common law doctrine of self-defense to defamation.

At the invitation of the Public Broadcasting System, Acanfora appeared with his parents on a program designed to help parents and homosexual children cope with the problems that confront them. Acanfora also consented to other television, radio, and press interviews. The transcripts of the television programs, which the district court found to be typical of all the interviews, disclose that he spoke about the difficulties homosexuals encounter, and, while he did not advocate homosexuality, he sought community acceptance. He also stressed that he had not, and would not, discuss his sexuality with the students.

■ In short, the record discloses that press, radio, and television commentators considered homosexuality in general, and Acanfora's plight in particular, to be a matter of public interest about which reasonable people could differ, and Acanfora responded to their inquiries in a rational manner. There is no

evidence that the interviews disrupted the school, substantially impaired his capacity as a teacher, or gave the school officials reasonable grounds to forecast that these results would flow from what he said. We hold, therefore, that Acanfora's public statements were protected by the first amendment and that they do not justify either the action taken by the school system or the dismissal of his suit. *Cf.* Tinker v. Des Moines Independent Sch. Dist., 393 U.S. 503, 89 S. Ct. 733, 21 L.Ed.2d 731 (1969); Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); James v. Board of Educ., 461 F.2d 566 (2d Cir.) cert. denied 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972).

## III

On his application for a teaching position in the Montgomery County Schools, Acanfora responded to a request for information about his professional, service and fraternal organizations by mentioning only his student membership in the Pennsylvania State Education Association. In response to a request for information about his extracurricular activities, he listed swimming, bowling, student council, magazine and newspaper staffs, honor society, and Naval Reserve Officers Training Corps. He made no mention of his membership and official position in the organization known as the Homophiles of Penn State. Nevertheless, he verified that the information he submitted was accurate to the best of his knowledge.[1] His omission of the Homophiles was not inadvertent. To the contrary, he realized that this information would be significant, but he believed disclosure would foreclose his opportunity to be considered for employment on an equal basis with other applicants.

Acanfora protests that refusal to employ or retain him as a teacher violates the first and fourteenth amendments. He contends that the school system cannot defend on any deficiency in his application because it was his homosexuality, not omissions from the application, that led to the unconstitutional discrimination against him. The school officials admit that if Acanfora had revealed his affiliation with the Homophiles they would not have employed him. They assert, however, that Acanfora's intentional omission of his connection with the Homophiles bars his attack on the constitutionality of the school system's employment policy. In its written opinion, the district court dealt only inferentially with this aspect of the school system's defense. It found that to avoid rejection, Acanfora intentionally did not disclose his homosexuality in his application. It also found that the essential reason for Acanfora's transfer was his admitted homosexuality. However, it expressed no conclusion about the effect of Acanfora's misrepresentation, resting its decision instead on his public appearances after he was transferred.

## IV

In a number of criminal cases, the Supreme Court has held that a defendant charged with fraud may not challenge the constitutionality of the statute which required him to furnish the information that he misrepresented. Thus, in United States v. Kapp, 302 U.S. 214, 217, 58 S.Ct. 182, 82 L.Ed. 205 (1937), a defendant who was indicted for furnishing false information to secure benefits under the Agriculture Adjustment Act could not assert the invalidity of the Act as a defense. Similarly, a person charged with making false statements in connection with a loan lacked standing to question the constitutionality of the

---

1. The application form for employment in the Montgomery County school system, which Acanfora signed, contained the following paragraph:
   "Read Carefully Before Signing:
   The information as submitted on this application is accurate to the best of my knowledge, I concur in the above state-

ments and requirements. I understand that falsification of any information submitted on this application shall be cause for dismissal from service. I have signed this application form in the presence of a notary public, whose signature and seal appear below."

Home Owners Loan Act. Kay v. United States, 303 U.S. 1, 6, 58 S.Ct. 468, 82 L. Ed. 607 (1938). The subject was critically reexamined in Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), and Bryson v. United States, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 64 (1969), which dealt with the offense of filing false non-Communist affidavits to satisfy the requirements of the Taft-Hartley Act. Reaffirming earlier cases, the *Dennis* Court refused to consider the defendant's attack on the constitutionality of the statutory requirement for the affidavit:

> "It is no defense to a charge based upon this sort of enterprise that the statutory scheme sought to be evaded is somehow defective. Ample opportunities exist in this country to seek and obtain judicial protection. There is no reason for this Court to consider the constitutionality of a statute at the behest of petitioners who have been indicted for conspiracy by means of falsehood and deceit to circumvent the law which they now seek to challenge. This is the teaching of the cases." 384 U.S. at 866, 86 S.Ct. at 1847.

In *Bryson,* the Court rejected the argument that the misrepresentation was of no consequence because the government could not constitutionally elicit the information:

> "But after Dennis it cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." 396 U.S. at 72, 90 S.Ct. at 360.

The principles stated in *Kapp, Kay, Dennis,* and *Bryson* have not been confined to criminal cases. In at least two instances Rodriguez v. Seamans, 150 U.S.App.D.C. 1, 463 F.2d 837 (1972) petition for cert. dismissed 409 U.S. 1094, 93 S.Ct. 704, 34 L.Ed.2d 678 (1973) and Williams v. United States, 434 F.2d 1346, 1354, 193 Ct.Cl. 440 (1970) (Nichols, J., concurring), courts have sustained discharges of government employees for furnishing false information pertaining to their qualifications despite the fact that the government's questions were considered to be an unwarranted intrusion into constitutionally protected rights.

Acanfora asserts that the principles governing the foregoing cases do not apply to his situation because the school officials transferred him on account of his homosexuality, not the omission from his application. He relies on the principle that review of administrative action must be confined to the reasons assigned by the administrative agency. *See e. g.,* Securities and Exchange Com. v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966) cert. denied 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967). This argument fails, however, because it lacks a clear factual basis and because it is predicated on an unduly restrictive application of the principles expressed in *Dennis* and *Bryson.*

Before instituting this action, Acanfora did not exhaust his administrative remedies, and the school officials conducted no formal hearing. The district court, however, declined to tax either party with these procedural lapses. It ruled that a remand for an administrative hearing "would be pointless as the substantive rift has widened and the parties have shifted their attention to a plenary hearing in this forum." Therefore, the district court did not purport simply to review administrative action of the school officials. At the instance of both parties, it conducted an extensive trial on the merits of the case, admitting a great deal of evidence that had not been considered administratively. Under similar circumstances, we have ruled that a remand for an administrative hearing was unnecessary. *See e. g.,* Horton v. Orange County Board of

Educ., 464 F.2d 536 (4th Cir. 1972); Barker v. Hardway, 399 F.2d 638 (4th Cir. 1968).[2] Accordingly, the consequences of Acanfora's intentional omission of significant information from his application must be determined by examining the entire record of the district court proceedings, not just the administrative file that was compiled before the suit was instituted.

After Montgomery County school officials learned that Acanfora was a homosexual, the deputy superintendent wrote him that he was being transferred to a non-teaching position "while we gather information and assess the circumstances of the matter." At the same time, the school officials realized that Acanfora's application was incomplete because he had failed to include information about his affiliation with the Homophiles. They adverted to this omission during the course of this litigation, and it is apparent that they suspected Acanfora had purposely misled them.[3] However, during the administrative phase of the controversy, before in-

stitution of the suit, they had no proof that his act was intentional. Not until Acanfora testified at the trial could the school officials confirm their suspicions that he consciously omitted the Homophiles from his application for a teaching position to avoid rejection.[4]

■  It was Acanfora's testimony that furnished the school system a factual basis for the defense of misrepresentation. After Acanfora testified, the superintendent of schools unequivocally assigned the conscious withholding of information as a reason for his unwillingness to reassign Acanfora to a teaching position.[5] We conclude, therefore, that the school system should not be prejudiced because it did not include in the administrative file, as a reason for denying Acanfora a teaching position, information about his motives that were known to Acanfora but unknown to the school officials until he testified.

■■  Not every omission of information in an employment application will preclude an employee from attack-

2. We do not, however, approve of the parties' failure to use administrative remedies to resolve their differences. An effective grievance procedure might have eliminated this expensive, protracted litigation.

3. For example, in an affidavit opposing Acanfora's motion for summary judgment, a school official asserted:
"This litigation by reason of plaintiff's false application, is contrived in every sense of the word. He ought not to bootstrap his way into a constitutional issue out of such untruthfulness. Had he been truthful, defendants would not have been involved in this litigation as they would not have hired him in the first place."

4. The deputy superintendent of schools testified:
"Q In other words, would it be fair to say that neither the decision to transfer him nor the decision not to return him to the classroom had anything to do with his competency as a teacher?
A I think the central issue, by that point in time, and we are talking about late October and November, and so on, was what appeared to us to be the fact that he was an advertised, activist homosexual.
I think there was one other point that I had mentioned earlier. At least I thought I did, that was of concern to us, and that was

why Mr. Acanfora had not indicated his membership in the Homophile Society on his application form, and I don't know that I ever really knew the answer to that until in this courtroom yesterday when Mr. Acanfora indicated that he had consciously decided to withhold that information.
Q Do you recall him further indicating that, in his judgment, had he written Homophile Society of Penn State University down as a social, fraternal or extracurricular activity on his application that in his judgment, that would have ended his opportunity for employment with the Montgomery County school system?
A Yes, I recall him mentioning that. That was new information to me, also.

5. The superintendent of schools testified:
"Q Under the circumstances of this matter, as you understand them, would you reinstate Mr. Acanfora at this time?
A No.
Q What are your reasons for not doing so?
A You mean reinstate or reassign?
Q Reassign to the classroom setting.
A There are several reasons. Mr. Acanfora did not provide and consciously withheld information on his application which he was required to provide in the employment process. . . ."

ing the constitutionality of action taken by the governing body that employs him. But here Acanfora wrongfully certified that his application was accurate to the best of his knowledge when he knew that it contained a significant omission. His intentional withholding of facts about his affiliation with the Homophiles is inextricably linked to his attack on the constitutionality of the school system's refusal to employ homosexuals as teachers. Acanfora purposely misled the school officials so he could circumvent, not challenge, what he considers to be their unconstitutional employment practices. He cannot now invoke the process of the court to obtain a ruling on an issue that he practiced deception to avoid. "When one undertakes to . . . mislead [government officials] by false statements, he has no standing to assert that the operations of the Government in which the effort to . . . mislead is made are without constitutional sanction." Kay v. United States, 303 U.S. 1, 6, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938).

Affirmed.