**Lee HAMILTON et al., Plaintiffs,**

v.

**William SAXBE, Individually, and as Attorney General of the United States, et al., Defendants.**

**Civ. A. No. C74–97A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

March 24, 1976.

Jeffrey I. Jacobson, American Civil Liberties Union, Foundation of Ga., Atlanta, Ga., Alvin J. Bronstein, The National Prison Project of the American Civil Liberties Union, Washington, D.C., Ellen W. Leitzer, Ga. Civil Liberties Union, Atlanta, Ga., for plaintiffs.

John W. Stokes, Jr., U. S. Atty., Anthony M. Arnold, J. Robert Cooper, Asst. U. S. Attys., Atlanta, Ga., Mitchell B. Dubick, Special Litigation, Criminal Division, Department of Justice, Washington, D.C., for defendants.

## ORDER

EDENFIELD, District Judge.

Plaintiff Lee Hamilton, a federal prisoner incarcerated at the Atlanta penitentiary, brought this class action against defendant Attorney General and the various officers of the Bureau of Prisons for injunctive and declaratory relief. Jurisdiction of this court was invoked pursuant to 28 U.S.C. §§ 1346, 1361, 2201 and 2202 and pursuant to portions of the Administrative Procedure Act, 5 U.S.C. § 702–4. The plaintiffs seek to have this court declare that certain portions of the Bureau's regulation pertaining to visitation rights are unconstitutionally vague and overbroad, and that they create unreasonable classifications of those who are, and who are not, eligible to visit prisoners. Plaintiffs also seek to have this court enjoin the defendants from enforcing the above regulations and from enforcing "unwritten" rules which have allegedly been used by the Bureau's caseworkers in determining who shall be allowed to visit prisoners.[1]

### Certification of the Class

In an order of November 5, 1975, this court tentatively certified this case as a class action pursuant to Rule 23(b)(1) and (2), Fed.R.Civ.P., and defined the class as follows:

(1) All present and future male federal prisoners incarcerated in institutions maintained by the Federal Bureau of Prisons who seek to be visited by women whether or not they are their legal wives;

(2) All present and future women, legally married or unmarried, who have children by male federal prisoners, and

---

1. In its order of June 27, 1974, this court, in denying defendants' motion to dismiss, determined that it had jurisdiction to hear this action under 28 U.S.C. § 1361. In addition, the court held that the failure of any of the plaintiffs to exhaust administrative remedies would not be an appropriate basis on which to dismiss the action since: (1) the administrative remedy process was available only to the prisoners sought to be visited and not those who wished to visit, (2) the suit is a class action alleging a pattern of conduct engaged in by defendants affecting a large number of persons, (3) the complaint charges an ongoing denial of fundamental rights, and (4) the plaintiffs are challenging the very regulations by which the administrative reviewing officers would judge the practices at issue.

who wish to visit those prisoners; and

(3) All present and future children, whether or not legitimate, of federal prisoners.

By its terms, this definition includes all federal prisoners throughout the United States and the defined class of women and children who seek to visit these prisoners. When this matter came before the court for a hearing, however, it was apparent that the plaintiff class was comprised only of those federal prisoners incarcerated at the Atlanta facility and those women and children, as defined above, who wished to visit them. Although the regulations in question apply to all federal prisoners, the evidence introduced related only to how these regulations were applied by the officials at the Atlanta penitentiary, and all those who testified as members of the aggrieved class were incarcerated at that facility, or wished to visit someone incarcerated there. This court therefore now MODIFIES its prior tentative order and CERTIFIES the class as consisting of those who come within the above definition and who are incarcerated, or wish to visit someone incarcerated at the Atlanta penitentiary.

*Factual Background*

Bureau of Prisons Policy Statement 7300.4A reads in part:

"1. *POLICY.* In order to achieve the main objective of the Bureau of Prisons—correction of the offender—it is essential that the individual offender develop and maintain healthy family and community relationships. Due to the difficulty in fostering positive relationships in a penal or correctional setting, visits by family and community groups are to be stressed as an important factor in maintaining the morale of the individual offender and motivating him toward positive aspirations. Visits are to be utilized as opportunities for developing closer relationships between the staff, family members, and community groups for the purpose of more effective program planning. Visits should be conducted and supervised in a manner which will contribute to good public relations, to a better understanding of the institution's program, and to a better understanding of the overall mission of the Bureau.

\* \* \* \* \* \*

"5. *GUIDELINES.*

\* \* \* \* \* \*

e. *Regular Visitors.* The casework staff will be responsible for compiling a regular visiting list for each offender and the following should be placed on the approved list after suitable investigation:

(1) *Members of the Immediate Family*

This includes mother, father, stepparents, foster parents, brothers and sisters, wife or husband and children. Under ordinary circumstances, there would be no question about placing such persons on the regular visiting list of the offender.

(2) *Other Relatives*

These include grandparents, aunts, uncles, in-laws, and cousins, who may be placed on the approved list if the inmate wishes to have such visits regularly.

(3) *Friends and Associates*

The visiting privilege may be extended to friends and other non-relatives if it can be ascertained that the association or friendship is a genuinely constructive one and that the offender would profit from such continued contact.

(4) *Persons with Prior Criminal Convictions*

The existence of a criminal conviction of itself should not constitute a barrier to proposed visits. Consideration should be given to the nature, extent and recentness of the convictions as weighed against the value of the relationship. Each such case, however, should have the specific approval of the Chief Executive Officer or his designated representative.

\* \* \* \* \* \*

h. *Procedures.* The Chief Executive Officer of the institution is responsible for the establishment and enforcement of visiting regulations and their adaptation to the institution in accordance with the policies issued by the Central Office. He can, at his discretion, delegate to the Chief, Classification and Parole, such authority as he deems advisable. The Chief, Classification and Parole, shall be responsible for furnishing the Chief Executive Officer and other staff current information concerning all visitors and shall assist the Chief Executive Officer in the general supervision of this phase of institutional administration, however, the Chief Correctional Supervisor is responsible for the appearance of the visiting room and the selection and training of the Visiting Room Officer.

\* \* \*"

Although Lee Hamilton is one of the named plaintiffs in this action, no evidence was presented at the hearing pertaining to any limitation on his visitation privileges, apparently because the defendants have granted his visitation requests subsequent to the filing of the action. Evidence was presented on behalf of plaintiff Smith, however, and on behalf of various other members of the class. In essence, the plaintiffs have sought to demonstrate that the defendants have arbitrarily excluded various persons from the visitation lists of visitors because of a determination on the part of the defendants that such visits would not lead to the development of a "genuinely constructive" relationship.

Upon incarceration at Atlanta in January of 1973, plaintiff Smith requested to have plaintiff Marian Gail Mathews added to his visitation list. Mathews had lived with Smith prior to incarceration and had a son by him. At the same time, however, Smith has been legally married to Gwendolyn Smith. Smith's case manager declined to place Mathews on the visitation list because of a phone call he received from a woman claiming to be Gwendolyn Smith, who asked that Mathews not be placed on the list, and

apparently because of information in Smith's presentence report indicating that Mathews was involved with hard drugs. Since this action began, defendants have confirmed that Gwendolyn Smith does not have any objection to placing Mathews on Smith's visitation list. The defendants have therefore allowed Mathews to visit together with Smith's son, but have continued to deny her visitation on her own. The defendants have taken this course of action because of Mathews' background, which includes a minor police record, and because of their alleged continued inability to contact Mathews and discuss her status with Smith.

Alphonso Morris is a married prisoner in Atlanta whose wife lives in North Carolina. Because of the distance, Morris claimed that his wife is unable to visit with any degree of frequency. Morris had requested that three women who were unrelated to him be allowed to visit. He stated that two of the women were denied visitation, while the third request has not yet been acted upon. Morris stated that he was told by his case manager that the women could only visit if they were accompanied by his wife, or if they were accompanied by their husbands if they were married. Morris also testified that his wife wrote a letter to Morris's case manager giving approval to the visits requested, but no action was taken on the part of prison authorities until a second letter was written. Case manager Williams testified that the alleged first letter could not be found in Morris's file, but that the two requests were granted when the second letter from Morris's wife was received. Williams further testified that he allowed the visits only when he received approval from Morris's wife, because he felt that visits from other women could interfere with Morris's family relationship.

Robert Huff has been incarcerated since 1970, and has been at the Atlanta facility since 1974. Huff has had no social visits at the prison. In early 1975, Mrs. Ann Johnson attended an exhibit containing the work of various inmates. Johnson became interested in Huff's work and began to correspond with him on a regular basis. In

February 1975 Huff requested that Johnson be placed on his visitation list but his case manager denied the request, giving "administrative reasons" as the written basis for the denial. In June, Huff again requested that Johnson be allowed to visit him and in July his case manager approved the addition of Johnson to the list, giving as his reason "inmate's request." No written explanation was given to either Huff or Johnson for the change. At the hearing, however, case manager Williams stated that he was originally reluctant to allow Johnson to visit Huff because she had had no contact with him or his family prior to incarceration and because he was concerned that she would want to visit numerous other prisoners. He stated that he verbally informed Huff of the reasons for his action. When Johnson did not request to see more prisoners, she was placed on Huff's visitation list.

Herbert Jeulich has been incarcerated since 1953. Because of his long period of imprisonment, he has lost contact with friends outside prison. In May 1975 he requested that Ms. Cris Loukes and her two daughters be added to his visiting list. Jeulich stated that he was introduced to Loukes by another prisoner, Patrick O'Shea, while Jeulich was appearing in court in a civil rights matter. Both Jeulich and Loukes stated that they have continuously corresponded with each other and wish to marry upon Jeulich's release. Loukes stated that she has made inquiries about the possibility of marrying Jeulich now, but has made no formal request to the Bureau of Prisons. She testified further that she now considers Jeulich her husband since they were married by proxy in February. She also stated that she visited with Jeulich while he was at a Community Treatment Center in Chicago. Jeulich initiated his request to be visited by Loukes when O'Shea was transferred from Atlanta. In support of the request, Loukes submitted several letters from employers and acquaintances attesting to her good moral character. The request was denied by Jeulich's case manager on the ground that Loukes was "a former associate of former inmate." This decision was affirmed by the warden, who cited as his reason the fact that Jeulich did not know Loukes before incarceration but came to know her through her visits to another prisoner. Case manager Skaggs testified that he decided against allowing Loukes to visit because he felt that it could create security problems in the prison. Other inmates, he felt, might have thought that Loukes was "cheating" on O'Shea, although on cross-examination he admitted that he did not attempt to investigate Loukes's relationship with O'Shea. He also pointed out that Jeulich failed to disclose on his request form that Loukes had been visiting another prisoner. Finally, Skaggs testified that Jeulich's request presented a very close case and a difficult decision.

The plaintiffs claim that each of the above factual situations represent the prevailing practice at the Atlanta penitentiary of denying prisoners the right to visit with the women of their choice. They claim that the case managers (1) allow an inmate's wife to exercise a veto over the inmate's request to see other, non-related females, (2) do not allow the inmates to visit with individuals they met after incarceration, and (3) deny visitation rights to certain women based on vague and arbitrary determinations of what relationships are "genuinely constructive." Plaintiffs contend that the prison regulations, coupled with these unwritten rules, deny them their First Amendment rights of association, their right to privacy, and their right to procedural due process.

The defendants assert that the regulations are necessary to set a reasonable limit on the length and number of visits, to maintain security at the penitentiary, and to aid in the rehabilitation of the prisoner. Stanley Witkowski, the current Associate Warden for Programs, testified that each prisoner is allowed 265 hours of visiting time per month, with an unlimited number of visitors at any one time. Both he and the former associate warden, Harold McKernan, stated that a very open and casual visiting room atmosphere is maintained to enhance the value of the visit, and added that since most visitors were law-abiding

citizens, no search of visitors is generally conducted. Although visitors are not searched for drugs and contraband, the prisoners are subjected to a strip search after receiving visitors. Such a search is not totally effective, however, since capsules of drugs are often secreted in the various cavities of the body. More than one defendant testified to the occurrence of deaths in the past resulting from the swallowing of a drug capsule by a prisoner and the bursting of the capsule in his digestive system. Because of this danger to prison security, the defendants attempt to insure that prospective visitors will not be inclined to smuggle items to prisoners. Witkowski further testified that members of the family of the inmate are generally placed on the list immediately. Relatives and friends are placed on the list only after a check is conducted on their background, which is done by sending a questionnaire to both the prisoner and the proposed visitor and by sending an information form to law enforcement authorities. Former associate warden McKernan stated that a relative with a criminal record is generally allowed to visit with an inmate, depending upon the particular facts in each case.

All of the defendants who testified stated that one of their primary concerns in reviewing a prisoner's visitation list is to foster stable and constructive relationships for the prisoner. If the prisoner is married, they generally attempt to support this relationship. McKernan stated by affidavit that "[o]ur normal concern is to preserve a 'healthy' marriage where it exists, and naturally if a legal wife contacts us and speaks out against a girl friend, that girl friend is barred pending receipt of additional facts." He added, however, that "[w]ives of inmates do not have an unqualified right to prohibit other women from visiting their husbands. We have already explained that, where there is a marriage extant, we like to see such stable relationships preserved and avoid squabbles in our visiting room. Individual circumstances are considered, however, and we are flexible on this." Witkowski's testimony was of similar import; he stated that he had experienced several incidents at other prisons where a prisoner's girl friend and his wife had a confrontation in the visiting room and he related two instances in Texas where the prison authorities were named as defendants in alienation of affection suits because of their visitation decisions. Asked what his decision would be as to a female visitor if the prisoner's wife gave approval to the visit, he replied, "If she doesn't care, then I don't care." He later qualified that statement by adding that the approval of the wife does not automatically guarantee the visiting rights to other women.

Both Witkowski and McKernan stated that the husband-wife relationship was not always the most stable, and when it was apparent to them that the prisoner no longer had a viable relationship with his legal wife, they would allow the prisoner to visit with the woman with whom he had the closest relationship. McKernan also asserted that illegitimate children and common-law wives are recognized as members of the immediate family. "Ex-wives, paramours or girl friends are classified as friends or associates. It should be pointed out, however, that all the inmate has to do to elevate one of these to the status of common-law wife, and therefore a member of the immediate family, is to say that she is. We do not attempt to refute this."

In an effort to demonstrate that the defendants were less flexible than they claimed to be in their review of visitation requests, plaintiffs introduced into evidence written responses by prison officials to visitation requests. In one, dated April 1, 1975, the case manager informed the prisoner that "[u]nless there are unusual or mitigating circumstances, we do not approve visits of non-related females with married inmates. . . . If you can show justifiable reasons such as legal separation, pending divorce action, etc., we will consider your request. . . ." Another prisoner's request to add a woman visitor to his list was denied because he had supplied false information as to her marital status and because "it is the policy of this institution to allow married women to visit in-

mates only when accompanied by their spouse or the spouse of the inmate should he be married."

Apart from the problem of deciding what women shall be allowed to visit a married inmate, the defendants must also make a determination, pursuant to the Bureau's regulations, as to which individuals will make suitable visitors for the prisoner. Associate warden Witkowski testified that the determination of which relationships are "genuinely constructive" is a difficult one, but emphasized that there is a presumption of a stable and beneficial relationship if it is a long-standing one. McKernan stated that there is a presumption in every case that the prospective visitor is a law-abiding citizen and Witkowski claimed that the burden is upon the defendants to show why a particular person should not be allowed to visit. Witkowski did state, however, that it was better for the inmate to have more visits by a small number of people, rather than to have a large number of people visiting less frequently.

Again, the plaintiffs introduced various written responses to prisoner visitation requests to challenge the assertions of the defendants that the burden is on the government. In one case, the case manager denied the request because the prisoner had not submitted "in writing [his] justification for placing these individuals on [his] visiting list," and until the reasons why these individuals "would be beneficial to [his] readjustment into the community and the appropriate forms have been received," no approval would be granted. In another, the case manager stated, "The fact that _____ has an arrest record in itself does not constitute a barrier to proposed visits with you. It is just one of the factors considered. The fact that you and _____ are not related and have known each other only a short period of time is a major contributing factor that leads us to question the value of the relationship and the advisability of approving _____ for visits." In an administrative appeal to the regional director of the Bureau the director stated, in part, the

following reason for a particular denial: "In some cases visiting privileges are granted to close friends and associates if it can be ascertained that the association or friendship is a genuinely constructive one and that the offender would profit from such continued contact. Moreover, it is also necessary to consider visiting space available. I note that you have received visits from a first cousin and close friend. Therefore you are receiving visits. It is difficult for us to see how visiting with Mrs. _____, a recent acquaintance through a pen club, could be considered 'close friend and associate' as outlined in Bureau policy." In the same case, the prisoner's case manager pointed out that, because of space limitations, it was the penitentiary's policy to hold to a minimum the approval of non-family members with whom the prisoner has had no community contact prior to incarceration. The only major exception to this policy applies to those prisoners who would receive no social visits except those from pen pals. Finally, in another case, an inmate's request to be visited by the family of his codefendant, who was killed in an escape attempt, was denied because the prisoner's only contact with these individuals was through his codefendant and because "it is felt that little positive influence could be derived from your association with these people."

Both associate wardens McKernan and Witkowski emphasized that a prisoner who is dissatisfied with his case manager's decision may appeal to the case manager's supervisor, to the associate warden, or to even the warden. Moreover, if the prisoner is still dissatisfied, he may invoke the formal administrative remedy process [2] whereby he appeals first to the local prison staff, then to the regional director, and then to the national director of the Bureau.

Finally, McKernan stated that the staff of the Atlanta facility had to be "stricter with our visits" because of the maximum security nature of the prison. In addition, Witkowski explained that the formal visitation program was not the only avenue of communication that a prisoner had with the

2. *See* Bureau of Prisons Policy Statement No. A–2001–6 CH 2.

outside community. He stated that the prison has a very open correspondence policy,[3] that the prison encourages various groups from the community to intermingle with the inmates, and that each prisoner is allowed to make one telephone call every two months.

## Findings of Fact

Based on the entire record, as summarized above, the court makes the following findings of fact:

(1) The wives, whether through formal marriage or common-law marriage, and the children, whether legitimate or illegitimate, of inmates are automatically allowed visitation rights except in cases of extreme extenuating circumstances. The plaintiffs presented no evidence to demonstrate that this policy had not been followed in any particular fact situation.[4]

(2) The prison officials at the Atlanta penitentiary do not have a blanket rule forbidding married inmates to meet with unrelated women without the consent of the inmate's wife. In acting on individual requests from married inmates, however, it is clear that the officials place a substantial burden upon the inmate to demonstrate that the visits of other women will lead to a genuinely constructive relationship and will further the inmate's rehabilitation.

(3) Despite the defendants' official policy of placing the burden on themselves to demonstrate that non-relative visitors will be .harmful to the inmate, the defendant officers in fact require the inmate to show that the visits will be beneficial when the relationship with the proposed visitor is not longstanding, and especially when the relationship was established subsequent to incarceration.

(4) The inmate's "burden of proof" becomes significantly greater when the pro-

posed visitor has an arrest or conviction record, especially when this record relates to the inmate's own prior criminal activity.

(5) The defendants maintain a working review procedure whereby the inmate may challenge his case manager's denial of his visitation request.

## The Appropriate Legal Standard

The plaintiffs argue that the right of a prisoner to be visited by family and friends involves fundamental constitutional rights of association, privacy, and liberty of the prisoners and of those who seek to visit with them. They argue that because the challenged regulations and practices impinge upon fundamental constitutional rights, they must be shown by the defendants to further a compelling governmental interest. The plaintiffs argue further that the fact that some of the plaintiffs are prisoners is not a sufficient basis upon which to deny them their constitutional rights.

■ The plaintiffs are certainly correct in their assertion that a federal prisoner is not stripped of his constitutional rights when he enters the prison gate. But a prisoner only "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system," *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Thus, the question of what standard of review this court must apply in considering the government's reasons for its actions becomes more complicated than the plaintiffs suggest. Moreover, the cases cited by both plaintiffs and defendants relating to prisoners' access to, and association with, friends and relatives in the community demonstrate that no clear standard for judicial review has yet evolved.

3. *See* Bureau of Prisons Policy Statement No. 7300.1A, relating to mail correspondence.

4. The plaintiffs had claimed that prisoner Lee Hamilton had been denied the opportunity to visit with his common-law wife and son. However, no evidence was presented at the hearing

relating to Hamilton's claim, or to the actual relationship with his alleged wife. In addition, the court concludes that although Mrs. Loukes engaged in a marriage by proxy with Mr. Jeulich, such a ceremony does not qualify her as his wife since he does not consider himself to be married to her.

In *National Prisoners Reform Ass'n. v. Sharkey,* 347 F.Supp. 1234 (D.R.I.1972), the court was faced with a request to enjoin state correction officials from interfering with the right of an association of prisoners and non-prisoners from meeting within the prison. The court held that because the officials' actions interfered with important associational rights, they had not shown that their actions were no greater than were essential to the furtherance of an "important and substantial governmental interest." Because the defendants there failed to justify why they had excluded that particular group, but not numerous other groups, the court granted the requested relief.

In *Morales v. Schmidt,* 489 F.2d 1335 (7th Cir. 1973), *reh. en banc,* 494 F.2d 85 (1974), a prisoner sought to enjoin prison officials from preventing him from corresponding with the mother of his illegitimate child. The district court judge had held that the government had to demonstrate a "compelling state interest" in order to justify its action. The Court of Appeals rejected this standard and instructed the district court to apply the traditional "rational nexus" standard. In a concurring opinion, Judge Swygert argued that the government should demonstrate that there is a "substantial necessity" for its restriction upon the prisoner's correspondence rights, 494 F.2d at 88.

Subsequent to the original appeal decision in *Morales,* Judge Doyle, who was the district judge in that case, was called upon to determine the appropriate standard to apply in determining whether prison authorities could deny the right of a prisoner held in segregation to visit with his children. Justifiably uncertain as to the Seventh Circuit's position on the matter, the judge concluded after considerable discussion that the prison authorities need only show a rational basis for their action.

The only recent decision in this area to come from the Fifth Circuit is *McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir. 1975), in which the claim was made that prisoners had a constitutional right to conjugal visits. The court summarily rejected this assertion,

stating that "[v]isitation privileges are a matter subject to the discretion of prison officials."

The Supreme Court has had occasion to enunciate the appropriate standard for judicial review in a case pertaining to prisoners' correspondence in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Since both the prisoner and those who wish to communicate with him are affected by prison regulations relating to such correspondence, the Court concluded that censorship of prison mail is justified only if the regulation furthers "an important and substantial governmental interest unrelated to the suppression of expression" and if the limitation on First Amendment expression is "no greater than is necessary or essential to the protection of the particular governmental interest involved," *Id.* at 413, 94 S.Ct. at 1811.

The Court then muddied the waters somewhat in its decision in *Pell v. Procunier, supra.* The specific issue in that case was whether prisoners and members of the news media had the right to conduct face-to-face interviews in prison. The Court decided that they did not, but in doing so, the Court discussed the balancing of prisoners' visitation rights with legitimate governmental concerns. In particular the Court recognized three primary interests: deterrence, institutional security, and rehabilitation. *Id.* 417 U.S. at 822–3, 94 S.Ct. 2800. Each of these interests requires some restriction upon visitation: prisons can deter crime only if they are, in some degree, undesirable, and isolation from society accounts for much of this undesirability; similarly, insuring stability in the prison population and rehabilitating the prisoner both require that limitations be placed on the number and type of people admitted to the prison.

In considering whether the ban on visitation by the press denied prisoners their First Amendment rights, the Court considered other avenues of communication which were open to prisoners. One of these was visitations "from members of their families, the clergy, their attorneys, and

friends of prior acquaintance. The selection of these categories of visitors is based on the Director's professional judgment that such visits will aid in the rehabilitation of the inmate while not compromising the other legitimate objectives of the corrections system." *Id.* at 824–5, 94 S.Ct. at 2805. The Court later added that when " * * * [T]he question involves the entry of people into the prisons for face-to-face communication with inmates, it is obvious that institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system itself, require that some limitation be placed on such visitations. So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines 'prison officials must be accorded latitude.' *Cruz v. Beto*, 405 U.S. [319] at 321 [92 S.Ct. 1079 at 1081, 31 L.Ed.2d 263]." *Id.* at 826, 94 S.Ct. at 2806.

■ When *Pell* and *Martinez* are read together, it becomes apparent that the Court considers both correspondence and visitation to be protected in some degree by the First Amendment. Moreover, regulations affecting either form of communication must be tailored to achieve substantial governmental interests. However, it appears that the governmental interests need not be as compelling when the form of expression regulated is just one of a series of alternative forms of communication. In addition, it would seem that the means used to achieve the governmental interests need not be as tailored when the First Amendment interests are less substantial, but where the institutional concern for security and rehabilitation become more pressing. In any event, the Court has apparently discarded the use of such rigid standards as "rational nexus" and "compelling state interest", and has substituted in their place a more flexible balancing of the competing interests in each case.

■ Rather than apply either of these traditional standards, therefore, this court will examine the interests sought to be protected by the challenged regulations and determine whether these objectives are, in fact, furthered by the regulations in a means which does not unduly interfere with constitutional rights. In addition, the degree to which the means must be tailored to effectuate the enunciated goals will depend upon the importance of the particular constitutional rights on the one hand, and the substantiality of the governmental interests on the other.

■ Following the lead of the Supreme Court, this court accepts as legitimate and important the defendants' concern for the rehabilitation of their prisoners and the maintenance of institutional security. The court does not accept the view of the plaintiffs' expert witness, a psychologist with the Michigan Department of Corrections, that it is presumptuous for prison authorities to determine who can provide a prisoner with a genuinely constructive relationship. It is the duty of the defendants to help the prisoner maintain or establish those stable relationships which will serve as the focus of his life upon release from prison. Moreover, the defendants are properly concerned with the effect certain visitors will have upon the institution's security. This concern relates not only to those who might introduce drugs and other contraband into the prison, but also to those who have had relationships with other prisoners, and whose visits could trigger intense personal disputes within the prison.

■ To be balanced against these concerns are the admittedly substantial rights of prisoners to associate with their family and friends. But in weighing these rights, one must conclude that the importance of the right—whether grounded in the First Amendment or the right of privacy—diminishes as the relationship becomes more tenuous. This court need not decide now whether a prisoner has an absolute right to visit with his wife and children, since the plaintiffs have presented no evidence to show that the defendants are currently denying such visits. But as to friends, pen pals, fiancees, and even women who have

borne the children of prisoners, it is clear that no absolute right exists. The fact that prisoners are allowed to see members of their family, coupled with the fact that they are given considerable freedom to choose with whom they will correspond, reduces the substantiality of the right to visit with any particular individual. The defendants assert, and the plaintiffs have not attempted to disprove the assertion, that those women considered by the prisoners to be their common-law wives are allowed to visit. But when an inmate seeks to have his girl friend or paramour visit him, the defendants are entitled to look more closely at the relationship and make an independent judgment as to the appropriateness of the visit.[5]

 The conclusion that these rights are not absolute, however, does not give the defendants free rein to grant and deny visitation privileges at will. The defendants must base their decisions upon reliable facts about the proposed visitor's background and must not abdicate their responsibility to third persons, such as the wife of the prisoner. In addition, the defendants must insure that the prisoner is accorded adequate procedural safeguards. These include *meaningful* written responses to the prisoner's request and an opportunity to seek review of a denial from an officer other than the one who initially denied the prisoner's request. *Cf. Procunier v. Martinez, supra,* 416 U.S. at 417, 94 S.Ct. 1800 (1974).

 Based upon the findings of fact made above, this court concludes that the defendants have furthered their legitimate interests in a manner not unduly burdensome on the plaintiffs' rights. While it is true that the defendants place the burden on the prisoners to demonstrate that the visits of non-related individuals will aid in a prisoner's rehabilitation, the court believes that such a procedure is necessary to facilitate the decision of the case managers. Given the limitation of time and space, and the defendants' concerns as enumerated above, it is not asking too much of the prisoner to demonstrate that visits from a particular individual will aid in his rehabilitation. More importantly, however, the court notes that the burden of demonstration is generally placed on the prisoner only when some particular fact leads the case manager to believe that the visits would not be particularly beneficial to the prisoner or would endanger institutional security. For example, the case manager requires the prisoner to make some particular showing of additional benefit when (a) he is receiving visitors and wishes to add a mail correspondent to his list, (b) he wishes to add a visitor who has been visiting other inmates, or (c) he is married and wishes to add a non-related female to his list. Based upon their experience in dealing with visitation problems, the defendants have appropriately made tentative rebuttable presumptions as to the advisability of certain types of visits. The court does not believe that requiring the prisoner to overcome those specific tentative presumptions constitutes an unduly restrictive means of furthering the defendants' legitimate objectives. More-

---

**5.** The plaintiffs claim that they have a right to visit with the women of their choice whether or not they are married to these women because such relationships are protected by rights of privacy, *Mindel v. Civil Service Comm.,* 312 F.Supp. 485 (N.D.Cal.1970), *Williams v. United States,* 434 F.2d 1346, 1354–7, 193 Ct.Cl. 440 (U.S.Ct.Cl.1970) (concurring opinion, Nichols, J.). These opinions, however, merely hold that the government may not discharge an employee because he is living with a woman to whom he is not married when such a lifestyle does not affect the employee's job performance; and in both *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14. L.Ed.2d 510 (1965), and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the key privacy decisions of the Supreme Court, the government was seeking to prohibit actions which the court found to be within the protected zone of privacy. But here, the government seeks neither to penalize nor prohibit the private conduct of individuals. Rather, it is seeking to balance the prisoner's desire to visit with whom he chooses against its legitimate concern for security and rehabilitation. If this court were to extend the above-mentioned precedents to the visitation context, and conclude that every relationship the prisoner has with another person is subject to absolute protection, then the prison authorities would have no control whatsoever over whom the prisoner would be allowed to visit.

over, the fact that these presumptions are not written into the formal regulations neither denies the plaintiffs due process, nor makes the regulations overbroad. Each prisoner must be given written reasons for a denial, and he is granted an opportunity, through administrative appeal, to challenge the application of the presumption to his particular case. It would unduly restrict the defendants in the exercise of their discretion to require them to formally and fully codify the opinions they develop through experience about the appropriateness of certain visits. The court therefore concludes that the plaintiffs' request for injunctive and declaratory relief should be DENIED.

One final note is warranted. Federal judges, by and large, would not make particularly good wardens. This court, therefore, does not relish the thought of having to review every denial of a prisoner's visitation request. But when eight case managers must approve the visitation requests of over 2,000 inmates, individual cases of arbitrary action are bound to occur. The most feasible way of correcting such errors is through a meaningful review procedure. Such a procedure would help to guarantee that general inferences and presumptions held by case managers were not being applied mechanistically, without regard to the peculiar facts of each case, and would insure the system's flexibility and responsiveness. The court believes that the structure for such a system now exists. But should it come to the court's attention that supervisors and wardens are merely rubber-stamping the decisions of the case managers, this court will not hesitate to order an overhaul of the entire review process. The defendants themselves recognize the importance of a well-run visitation program; hopefully, they will provide the necessary procedural safeguards to insure the program's continued integrity.