Wesley WHITE, Mazola White, William Price, Wilhelemena Price, George J. Gruber, Jr., Beatrice F. Gruber, Clarence White, Wendell A. Hall, Thomas L. Gruber

v.

Gerald A. KELLER, Superintendent, Maryland Correctional Institution.

Civ. No. B–75–1879.

United States District Court, D. Maryland.

Aug. 29, 1977.

Charles F. Morgan, Baltimore, Md., for plaintiffs.

Henry J. Frankel, Asst. Atty. Gen., Baltimore Md., for defendant.

MEMORANDUM AND ORDER

BLAIR, District Judge.

This is an action by three prisoners (Clarence White, Wendell A. Hall and Thomas L. Gruber) and their parents against the Superintendent of the Maryland Correctional Institution. Predicated on 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3–4), 2201–02, the complaint alleges that defendant has unlawfully restricted plaintiffs' visiting rights.

In November 1975, the prisoner plaintiffs each received visits after which they were discovered to be in possession of contraband. Clarence White, after a visit by his two sisters, Addie White and Roseanna Miles, was found with $5.00 and was sentenced by the Inmate Adjustment Team to ninety days in segregation and additionally was denied visitation privileges for the same period. Wendell Hall, after being visited by a friend, Lenetta White, was discovered to be in possession of marijuana; the Adjustment Team sentenced him to six months in segregation and denied his visitation privileges for ninety days. Thomas Gruber was visited by his wife and daughter, after which he was found in possession of marijuana, given six months in segregation by the Adjustment Team, and denied visitation privileges for ninety days. In each of these instances, defendant Keller allegedly reviewed the decision of the Adjustment Team pursuant to regulations of the Maryland Division of Correction and approved the conviction and punishment.

The case was brought as a class action by two groups of named plaintiffs: the affected prisoners and their parents. The prisoners sue on behalf of all inmates at the institution and the parents sue on behalf of all approved visitors for those inmates. The requirements of F.R.Civ.P. Rule 23 appearing to the court to have been met, two classes were conditionally certified:

'1) the class of all inmates presently confined at the Maryland Correctional Institution (hereinafter "the inmate class"), and

2) the class of all persons on the approved visiting lists of persons in the first class (hereinafter "the visitor class").

Both classes seek declaratory and injunctive relief and the named parties seek damages as well.

All named plaintiffs in the visitor class were permitted to resume their visits before the class was conditionally certified. The claims for injunctive relief of the named plaintiffs in the visitor class are and have been moot since the restoration of their visiting privileges. But because the class has already been certified, declaratory relief is sought, and the challenged action is likely to repeat itself at any time, a sufficient controversy exists to satisfy Article III and the court will not de-certify the visitor class, see *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 752–757, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); see also *Kremens v. Bartley*, 431 U.S. 119, 127–136, 97 S.Ct. 1709, 1714–18, 52 L.Ed.2d 184 (1977), and will address the issues raised by its prayer for declaratory relief.[1]

No material facts are in dispute. Plaintiffs have moved for summary judgment on all issues except damages; defendants have filed a similar cross motion. A hearing on the motions was held on May 6, 1977.

The complaint alleges two causes of action. The first claim asserts that defendant's restriction of visiting rights violates both plaintiff classes' constitutional rights to freedom of association, expression, and privacy since no "legitimate, compelling, reasonable, or identifiable State interest" is served by the visiting restrictions. Secondly, the visitor plaintiffs contend that they were deprived of adequate, written notice prior to the termination of the visiting privileges and of a full and fair hearing to contest imposition of the sanctions. The

---

1. One other note as to mootness is in order. Only Wendell Hall remains at the Maryland Correctional Institution. Gruber's and White's injunctive and declaratory claims are thus moot. The class action proceeds nonetheless, with Hall as the sole representative of the prisoner class.

former claim is premised on the First, Fifth, Ninth and Fourteenth Amendments, the latter on the First and Fourteenth.

## I. *The Restriction of Visitation*[2]

Plaintiffs do not argue, as indeed they cannot in this court's view, that visitation rights may never be restricted. What they do argue is that visiting rights are constitutionally protected and may be restricted only to serve a legitimate and compelling state interest. Moreover, they argue, these rights may be limited only in the manner which least restricts their exercise.[3]

The court has conducted an exhaustive search of the reported decisions on prison visitation. The cases, not surprisingly, divide into two categories: (1) attacks on the validity of visiting restrictions generally and (2) attacks on visiting restrictions as applied in individual cases. Although the instant action falls into the latter category, both sets of cases are relevant because the present one goes further than most of the cases in the latter category. The bulk of those cases faced only the issue of *whether* visiting rights could be restricted in individual cases; they did not confront the issue of the limitations on such restrictions. The instant case does present this latter issue

and hence those cases which have treated the issue of the general right to visitation are relevant.

Although the analysis in both categories of cases has varied tremendously, both in approach and in amount, and although the results in the two groups have been less than uniform, the results have been unanimous in one respect: there is no absolute right to prison visitation. *E. g., McCray v. Sullivan*, 509 F.2d 1332, 1334 (5th Cir. 1975); *Thomas v. Brierly*, 481 F.2d 660, 661 (3d Cir. 1973); *Walker v. Pate*, 356 F.2d 502 (7th Cir.), *cert. denied*, 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678 (1966); *Hamilton v. Saxbe*, 428 F.Supp. 1101, 1112 (N.D.Ga. 1976); *Feazell v. Augusta County Jail*, 401 F.Supp. 405, 407 (W.D.Va.1975).

The question then becomes: is there *any* right to visitation, and if so, does the existence of that right limit the discretion of prison officials in restricting visitation. Here the cases are in disarray. The weight of authority is that there is no affirmative constitutional right to visitation,[4] *Underwood v. Loving*, 391 F.Supp. 1214, 1215 (W.D.Va.1975); that is, constitutional challenges asserting a right to visitation fail even to state a claim.[5] *McCray v. Sullivan,*

2. This section deals only with the existence of a *constitutionally* protected right to visitation. Statutory problems will be dealt with *infra.*

3. This "least restrictive means" argument derives from a series of first amendment cases, including some in the prisoner context, holding that curtailment of first amendment freedoms is permissible only to serve a substantial or compelling state interest and then only by the means least restrictive of the freedoms curtailed. *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

*Procunier* involved a challenge to prison mail regulations. The Court viewed the issue as "the appropriate standard of review for prison regulations restricting freedom of speech", 416 U.S. at 406, 94 S.Ct. at 1808 and held "that censorship of prisoner mail is justified if the following criteria are met." First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Second, the limitation of First Amendment freedoms must be no greater than is necessary

or essential to the protection of the governmental interest involved. 416 U.S. at 413, 94 S.Ct. [1800] at 1811.

Specifically, plaintiffs argue that rather than suspending all visits temporarily and those from one visitor indefinitely, defendant could have imposed a less drastic restriction such as non-contact visitation. Non-contact visitation presumably protects defendant's interest in security while preserving plaintiffs' visitation privileges. Similar less restrictive measures might also be utilized.

4. The emphasis on an "affirmative" right is to distinguish the possible existence of a negative right which might be implicated under the eighth amendment if all visitation was denied permanently.

5. The fact that due process and equal protection challenges to visiting restrictions may state a claim is not at odds with the statement in the text. Such challenges are sustained as attacks on the *manner* of administering *permitted* visitation, and not as demonstrations of any affirmative constitutional right to visitation. For an example of such a due process challenge, see Part II *infra.*

supra; *Walker v. Pate, supra; Thompson v. Warden*, No. H–77–808 (D.Md.1977); *Feazell v. Augusta County Jail, supra; Henry v. Delaware*, 368 F.Supp. 286, 288 (D.Del. 1973). There are two peculiarities to be noted. One is that the cases holding that there *is* a constitutional right to *some* visitation are the more reasoned cases. Those holding there is no such right tend to just do so. *Compare, e. g., Hamilton v. Saxbe*, 428 F.Supp. 1101 (N.D.Ga.1976) *and Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976) *with McCray v. Sullivan, supra, and Henry v. Delaware, supra.* However, what few courts of appeals decisions there are fall into the latter category. *E. g., McCray v. Sullivan, supra; Walker v. Pate, supra.* Research has uncovered no Fourth Circuit or Supreme Court decision precisely on the point and this court, in looking elsewhere for guidance, has thus found conflicting paths: the more reasoned decisions go one way and the more compelling authority goes the other.

█ It is the opinion of this court that reasoning leads in the same direction as authority and that neither the named plaintiffs nor the class members have been denied any constitutional right. Although the named plaintiff visitors are the parents of the named inmates, they do not sue as parents *qua* parents but as parents *qua* visitors. Hence the question presented is that of the constitutional right to visitation generally and not that of the right to visits from family in particular. Although the court believes that the distinction between family and general visitation is not constitutionally significant, in the prison context it should be noted that the Supreme Court has recently drawn distinctions with respect to rights of association generally and rights of familial association. *Compare Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) *with Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

This court concludes that there is no constitutional right to prison visitation, either for prisoners or visitors. Plaintiffs do not argue a substantive due process right to visitation, and the court notes in passing that such an argument probably could not be sustained. *Cf. Moore v. City of East Cleveland, supra*, at 431 U.S. 498–512, 97 S.Ct. at 1937 (substantive due process limited by "respect for the teachings of history [and], solid recognition of the basic values that underlie our society"). Rather, they seek to base the right to visitation on the firmer constitutional footings of freedom of association and right to privacy.[6] But in the opinion of this court, neither of these rights will sustain the correlative right asserted against the restrictions here challenged.

█ It is clear that free members of society have rights of physical association, whether grounded in the first amendment—a source about which this court has serious analytical reservations—or in the concept of liberty—a more satisfying source analytically.[7] It is equally clear that what-

**6.** Although the right to privacy is something of a substantive due process concept itself, the Supreme Court has found it implicit in numerous specific constitutional guarantees, making it far less amorphous than true substantive due process liberties such as that articulated in *Moore. See, e. g., Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**7.** Freedom of association, as articulated by the Supreme Court, had its genesis in freedom of speech. *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). It has always meant the right to associate ideologically: "for the advancement of beliefs and ideas." *Abood v. Detroit Board of Education*, 431 U.S. 209, 233, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977); *McCrary v. Runyon*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), *aff'g*, 515 F.2d 1082 (4th Cir. 1975); *NAACP v. Alabama*, 357 U.S. at 460, 78 S.Ct. at 1171. The "right is protected because it promotes and may well be essential to the '[e]ffective advocacy of both public and private points of view, particularly controversial ones' that the First Amendment is designed to foster." *McCrary v. Runyon*, 427 U.S. at 175, 96 S.Ct. at 2596.

As this court sees it the essence of prison visitation is not the ideological association recognized by the courts as protected by the first amendment. Rather, prison visitation raises questions of the right to physical association. The right sought is to see and visit in person with another individual. There may well be a first amendment right to physical association, *see Griswold v. Connecticut*, 381 U.S. 479, 483,

ever the source and whatever the extent of the right to associate physically in free society, that right may be curtailed upon conviction for violation of the criminal laws. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* —— U.S. ——, —— – ——, 97 ·S.Ct. 2532–2538–40, 53 L.Ed.2d 629 (1977). To the extent that the right to physical association is grounded in "liberty," it is obvious from the language of the fifth and fourteenth amendments that the state may wholly deprive one of it upon a criminal conviction. It is less obvious, but equally sensible, that the right is lost even if its source is the first amendment.

[It is a] familiar proposition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying

our penal system." In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights *that are not inconsistent with his status as a prisoner* or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800,· 2804, 41 L.Ed.2d· 495 (1974) (citations omitted; emphasis added).

Perhaps the most obvious of the First Amendment rights that are necessarily

---

85 S.Ct. 1678,· 14 L.Ed.2d 510 (1965) (right of association includes right to attend a meeting); *see also De Jonge v. Oregon,* 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937), but if there is, it is because such association is part and parcel of the expression of ideas. For example, the first amendment expressly protects the freedom of assembly, which is patently a right to associate physically. But this freedom must be read in context; it is not simply a right to associate physically, it is a right to associate physically for the purpose of expressing ideas. *See De Jonge v. Oregon, supra.* And it is not a right merely to be together, it is a right to *assemble*; it connotes a gathering, not a visitation. While the argument could be made that it includes all physical associations, since no doubt meaningful, protected ideas might be exchanged on any such occasion, the court is doubtful that the rights of association and assembly are so broad. The history, nature and purpose of the first amendment do not warrant this conclusion. Although the amendment protects *all* ideas, its essence is political. *Cf. De Jonge v. Oregon,* 299 U.S. at 364, 57 S.Ct. 255. It forbids the *government* from abridging the freedoms secured therein in order to preserve the right of the· people to discuss and express ideas distasteful to the government. The first amendment has been expanded well beyond this concept, but to find in that amendment a right of mere physical association seems unwarranted. *Cf. Village of Belle Terre, supra* (no right of unrelated persons to live together).

The court believes that there is a right of physical association, but that its true source is the physical liberty of every individual. This is not a resort to substantive due process and the finding of rights implicit in the term "liberty" as used in the fifth and fourteenth amend-

ments. *See Moore v. City of East Cleveland, supra.* The primary liberty protected by the due process clauses is the right to be free from bodily restraint. This necessarily implies a right to go from place to place and to associate physically with others who are likewise free. This liberty is not absolute. The Constitution does not prevent its deprivation, but only its deprivation without due process. When the physical liberty of an individual is at stake, due process requires some form of notice and an opportunity to be heard. But once due process is accorded, liberty may be restricted.

The Supreme Court's recent opinion in *Jones v. North Carolina Prisoners' Labor Union, Inc.,* —— U.S. ——, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) is not to the contrary. While the case may be read to imply that there is a first amendment right of *physical* association outside the prison walls, *id.* at ——, 97 S.Ct. 2532, nothing in the case suggests that the Court was concerned with mere physical association independent of some ideological reason for associating. Thus this court maintains the belief that any first amendment right to mere physical association is so attenuated from the true protections of that amendment as to not be deserving of the usual strictures placed on abridgement of first amendment rights, including restriction only by the least drastic means. In other words, an individual may be entitled to have his right to associate ideologically restricted only upon a showing by the state of a substantial interest and then only by the least restrictive means. *See Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800 (1974). But the right to associate physically, at least in the prison environment, may be restricted by any reasonable means upon any rational and legitimate basis. *But see* note 4 *supra.*

curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution.

*Jones v. North Carolina Prisoner's Labor Union, Inc.,* —— U.S. ——, ——, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977).

Freedom of physical association is inconsistent with an incarcerative penal system. Accordingly, this court believes that prisoners have no associational right to receive visitors. This right is lost in accordance with due process at the time of criminal judgment.

 Plaintiffs' claim of a right to visitation cannot be sustained on the basis of their right to privacy either.

Protection of privacy does not extend to the inmates of a prison confined there after a due process determination that they have violated criminal laws. Conviction of crime carries not only loss of liberty, but also other impairments associated with membership in a closely supervised prison community. The range of free activity for prisoners within the prison is relatively small.

*Paka v. Manson,* 387 F.Supp. 111, 122 (D.Conn.1974). Furthermore, although the Supreme Court has not yet delimited the full range of interests protected under the rubric of the right to privacy, it strikes this court that prison visitation does not come within any reasonable contours of the right, given the nature of the interests deemed protected thus far. *See Carey v. Population Services International,* 431 U.S. 678, 682–688, 97 S.Ct. 2010, 2015–16, 52 L.Ed. 2d 675, 4602–03 (1977); *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). "These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325, [58 S.Ct. 149, 152, 82 L.Ed. 288] (1937), are included in this guarantee of personal privacy." *Roe,* 410 U.S. at 152, 93 S.Ct. at 726. Prison visitation is not such a right.[8]

It is the further opinion of this court that the Supreme Court itself has suggested there is no general right to prison visitation for either the prisoners or the public. In *Pell v. Procunier, supra,* the Court held that prisoners have no constitutional right to visit with members of the press and that members of the press have no constitutional right to visit with selected prisoners. Although the Court's principal concern was freedom of expression—press and speech—rather than freedom of association, the result was nonetheless that the two groups had no right to visit with each other. Implicit in the Court's opinion is that prisoners have no right to associate face-to-face with any particular member of the public, and members of the public have no right to so associate with any particular prisoner.

In reaching its conclusion in *Pell* the Court stressed the availability to both groups of plaintiffs of alternative means of communication. Among those alternatives the Court noted that the prisoner plaintiffs were allowed visits with family, clergy, relatives and friends. At least one court has read this aspect of *Pell* to indicate that there does exist a right of prison visitation, but that it is not a fundamental right requiring a *compelling* state interest to justify its restriction; rather, the court concluded, visitation is a non-fundamental right which can be restricted by the state on the lesser showing of a *substantial* state interest. *Hamilton v. Saxbe,* 428 F.Supp. at 1111. *See also* note 3 *supra.*

This finding in *Pell* of a right to visitation seems unwarranted. *Pell* did not discuss the issue of visitation *qua* visitation,

---

8. As noted earlier, the court does not address the question of the right to familial visits, but only the right to visitation generally. It could be argued that the result would be different for familial visits in view of the Supreme Court's recent decision in *Moore* although, as noted earlier, this court is of the view that there is no distinction of constitutional significance, at least in the prison context. *See also Mabra v. Schmidt,* 356 F.Supp. 620, 630–31 (E.D.Wis. 1973).

but as one of several alternative means by which the two groups of plaintiffs could communicate with each other. The Court prefaced its discussion in *Pell* with the familiar axiom that prisoners do not retain all the rights guaranteed to the public-at-large, but only those rights not inconsistent with an incarcerative penological system. 417 U.S. at 822, 94 S.Ct. 2800. Among the retained rights are freedom of speech and press, but within limitations consistent with the fact of imprisonment. The result is that freedom of expression and the right to communicate are retained, but the manner of their exercise is within the scope of prison authorities' discretion. 417 U.S. at 826–27, 94 S.Ct. 2800. The Court neither authorized nor required any particular means of communication but merely noted that the means in fact afforded were sufficient to permit the exercise of the retained rights. *See id.* at 827–28, 94 S.Ct. 2800. Visitation does not seem to be a right, but merely one means of effecting a wholly distinct right.

■■■ In any event, whether visitation is a right or not, it is at best a non-fundamental right, and hence may not only be restricted, but may be restricted by other than the least drastic means.[9] Plaintiffs' claim that the least restrictive means should be applied in the imposition of visiting restrictions is rejected. Moreover, any claim by plaintiffs that the facts in this case do not present a sufficient state interest to justify the visiting restrictions imposed is likewise rejected. In fact, this case involves perhaps the most compelling state interest of all—the maintenance of internal prison discipline and security by the prevention of the smuggling of contraband into an institution. This court entertains no doubt that from a constitutional perspective the violations with which the prisoners in this case were charged justified the application of the restrictions imposed.

An examination of the . . . restrictions on . . . association that have been imposed by the regulations under challenge, demonstrate that the restrictions imposed are reasonable, and are consistent with the inmates' status as prisoners and with the legitimate operational considerations of the institution.

. . . . .

First Amendment associational rights . . . must give way to the reasonable considerations of penal management. As already noted, numerous associational rights are necessarily curtailed by the realities of confinement. They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment. As we noted in *Pell v. Procunier,* 417 U.S., at 823, [94 S.Ct. [2800], at 2804], '*central to all other correctional goals* is the institutional consideration of internal security within the correctional facilities themselves.'

9. Even among those courts which have read *Pell* and the Constitution to require some visitation there is no suggestion that such rights are so fundamental as to be curtailable only by the least restrictive means. Rather, they have read *Pell,* not unreasonably, as suggesting that the proper approach to prisoners' rights is one of balancing the competing interests of the prisoner and the state. *E. g., Hamilton v. Saxbe,* 428 F.Supp. at 1111; *Barnes v. Government of Virgin Islands,* 415 F.Supp. 1218, 1228 (D.St. Croix 1976); *Pugh v. Locke,* 406 F.Supp. 318, 328–30 (M.D.Ala.1976). Most of these cases are in the first of the two categories mentioned earlier in this Memorandum and Order—they deal with challenges to visitation policies as applied to entire prison populations. None of these cases even remotely suggests that individual restrictions imposed as disciplinary sanctions are impermissible or subject to limitation if imposed in accordance with the dictates of due process and within the confines of the eighth amendment. One court, for example, while requiring the establishment of visitation privileges for prisoners generally, expressly stated that such privileges were subject to limitation or *removal* for disciplinary purposes or abuse. *Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971) (pre-*Pell*). *See also* note 7 *supra.*

*Jones v. North Carolina Prisoners' Labor Union, Inc.,* —— U.S. at ——, 97 S.Ct. at 2540, 2541 (emphasis added).[10]

The foregoing clearly explains why this court believes there is no right among prisoners to receive visitors. The court believes that the non-existence of a right among would-be visitors to visit prisoners is a necessary corollary whose justification is apparent by resort to the *reductio ad absurdum.* If would-be visitors can demand the right to visit, can they demand the right to have prisoners incarcerated near their residences so as to facilitate those visits? Can they demand that a convict not be incarcerated at all because of the infringement on their associational rights? The court believes that this is one of those situations where third party rights must fall with the lawful loss of the correlative right.[11] *See Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

## II. *Due Process*

The plaintiffs' second claim is that even if visiting privileges may be removed, and may be removed by other than the least restrictive means, nevertheless the removal in this case denied them due process. Counsel conceded at the hearing on the present motions that the Inmate Adjustment Team hearings afforded the *prisoner* plaintiffs satisfied the requirements as to them of procedural due process. Three issues remain for the court: (1) Were the visitor plaintiffs afforded the requisite due process in the restriction of their right to visit the prisoner plaintiffs? (2) Were the restric-

---

**10.** One final word on *Jones* is in order. The opinion contains some indication that the least drastic means doctrine applies to limitations on prisoners' first amendment freedoms: "the regulations are drafted no more broadly than they need be to meet the perceived threat". —— U.S. at ——, 97 S.Ct. at 2542. There are at least two compelling reasons why even if the doctrine applies in *Jones,* it does not apply in the present case. First, *Jones* was an across-the-board restriction on the prison population generally. The instant case involves individual restrictions based on individual misdeeds. An appropriate analogy is to conviction itself. The courts of this country have never to this court's knowledge been limited in the sentencing of a duly convicted offender to the punishment least restrictive of first amendment, or any other, freedoms. The eighth amendment and the due process clause are the constitutional framers' express limitations on sentencing. It seems to this court that the same limitations should apply to punishment imposed after the due process conviction of inmates on institutional charges. If the punishment bears some reasonable relation to the nature and severity of the offense and is not cruel and unusual within the historical meaning of the eighth amendment, then it should be sustained. *See Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

Second, *Jones* dealt with an association that had ideological ramifications. The instant case does not. *Jones* thus concerned a fundamental right where this case does not. *See notes 7 and 9 supra; Pell v. Procunier, supra.* See also *Procunier v. Martinez, supra.*

**11.** The court has fully considered both *Procunier v. Martinez, supra,* and *Hopkins v. Collins,* 411 F.Supp. 831 (D.Md.1976), relied on by plaintiffs to support their assertion of a right in the visitor class to visit and to be afforded due process in the denial of visits. These cases are wholly distinguishable from the instant case for several important reasons. One is that they involved mail rights, rights not inconsistent with an incarcerative penal system and hence retained. Moreover, mail rights are perhaps the most important first amendment rights in the prison environment. Use of the mails enables a prisoner and his correspondent to exchange ideas—the fundamental protection of the first amendment—in a manner wholly consistent with legitimate penological objectives and concerns; prison administrators are not confronted by the serious risks inherent in confrontation and assembly of prisoners *inter se* and of prisoners and outsiders. "[T]hough prison administrators may not control topics of conversation, they may, and indeed must, control access to the prison inmate population. Every time a gate swings open in a penitentiary, security is breached. Every entry presents the possibility of escape and every visitor is a potential hostage. . . . [W]hat [prison administrators] can control is access, not topical discussion." *North Carolina Prisoners' Labor Union, Inc. v. Jones,* 409 F.Supp. 937 (E.D.N.C. 1976) (three-judge court), *reversed,* —— U.S. ——, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). As this passage demonstrates there are significant differences between visitation and mail. In the instant case, much as in *Pell v. Procunier,* alternative channels of communication are open to both prisoner and visitor, and foremost among these is the mail. Neither had the right to visit the other in *Pell* and neither has the right here. *Accord, Craig v. Hocker,* 405 F.Supp. 656, 674 (D.Nev.1975).

tions imposed administratively permissible? (3) Did the defendants comply with established administrative procedures in imposing the instant restrictions?

### A.

██ As Section I, *supra,* makes clear, the visitor plaintiffs have no constitutional right to visit the prisoner plaintiffs. In other words, they have no liberty or property interest, as a constitutional matter, in visiting the prisoner plaintiffs. Having no liberty or property interest in visitation, they need not be afforded due process in conjunction with the limitation of visitation by the state.

██ Besides those constitutional rights deemed to be implicit in the concepts of liberty and property, and thus protected by due process against arbitrary deprivation by the state, the courts have recognized other sources of protected interests. One of those sources is presented by the facts of this case as an alternative reason why visitation is a liberty or property interest protected by due process. In particular, a state may create liberty and property interests by granting certain rights and privileges to its citizens. Where a state purports to confer a significant benefit on an individual and in so doing creates a reasonable expectancy that the benefit will be of a continuing nature, any attempt to deprive the individual of the benefit must be accompanied by due process in order to prevent the arbitrary administration of the laws. *See generally Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 858, 97 S.Ct. 2094, 2117, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring); *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Board of Regents v. Roth,* 408 U.S. 564, 573, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

██ In this case the state has granted each prisoner at the Maryland Correctional Institution the privilege of receiving visits from any ten persons designated by the prisoner and approved by the Institution.

The fact that the state allows a prisoner visitors creates no liberty or property interest in the visitor, however, because it is only by the *prisoner's act* of placing that person on his visiting list that the visitor acquires any privileges. The visitor has no independent right to visit; the relevant rights are all the prisoner's. Hence the visitor plaintiffs in this case cannot be said to have been deprived of a liberty or property interest and have suffered no denial of due process in the imposition of the visiting restrictions at issue here. The state has created in its prisoners a right to designate and receive visitors; it has not created a right in the public to visit. Having given nothing to the visitor plaintiffs the state has taken nothing from them by imposing the instant restrictions.

### B.

██ Not only may a state create a liberty or property interest in a substantive right or privilege but it may equally create such interests in procedural guarantees. Thus, in appropriate circumstances, state-created rules of procedure may confer upon individuals the right to the benefit of those procedures and the failure to afford or abide by them is a denial of due process. *United States v. Heffner,* 420 F.2d 809, 810–811 (4th Cir. 1970).

██ In this case plaintiffs argue that under the applicable prison regulations the visiting restrictions imposed herein were not permissible punishments for the infractions charged. Specifically, plaintiffs point out that theirs were "major" infractions for which the following penalties are prescribed: "any one or more of those penalties designated for minor infractions, or . . . one or both of the following penalties:

(a) Loss of good conduct time to exceed five (5) days.

(b) Confinement to exceed fifteen (15) days."

Maryland Division of Correction Regulation 105–2(4)(c)(11). Penalties for minor infractions are:

"(a) Counselling and/or warning.

(b) Reprimand.

(c) Adjustment release, i. e. probation within the institution.

(d) Temporary loss of one or more privileges.

(e) Loss of good behavior time (not to exceed five (5) days.

(f) Confinement (not to exceed fifteen (15) days)."

*Id.,* Reg. 105–2(4)(b)(5).

Plaintiffs argue that restriction of visitation is not one of the enumerated penalties and hence the state has not followed its own regulations. This contention is patently without merit. Visitation is unquestionably a privilege within the meaning of the minor violation penalties. *See* Regulation No. 195–1(4)(e), quoted *infra.* Hence there was no denial of due process in the imposition of visiting restrictions.

 It might be argued that the permissible penalty is "[t]emporary" loss of privileges and here each plaintiff was denied one visitor indefinitely. The short answer to this contention is that the privilege of having visitors was denied only temporarily; the regulation gives no right to have the restriction as to any particular visitor be merely temporary.

### C.

 Lastly, plaintiffs argue a second failure of prison authorities to comply with their own regulations. In particular plaintiffs argue that Division of Correction Regulation 195–1(4)(e) requires prison officials to inform both plaintiff prisoners and plaintiff visitors of the restriction or termination of their visiting privileges and the reasons therefor. There is no contention that plaintiff prisoners were denied the required notice and documentation, only that plaintiff visitors were. The court believes that plaintiffs seek to read too much into Regulation No. 195–1(4)(e), which provides:

The Managing Officer of an institution may deny any person on the visiting list the privilege of visiting if the visitor violates institution rules, or if the visitor's actions are disruptive, or if such individual endangers security. A Managing Officer will not deny visiting privilege on the basis that the visitor was a former inmate. If any person is denied the visiting privilege, the reasons will be fully documented and a copy placed in the base file and a copy provided the Central Office, Attn: Operations. Both inmate and proposed visitor in question will be advised of the action.

The regulation clearly does not require that documentation go anywhere but in the prisoner's base file and to the Central Office. There is no requirement that any terminated visitor receive documentation of the reasons for the termination. The only requirement is that the disruptive visitor "be advised of the action," which this court construes to mean "be advised of the fact of the restriction of the visiting privilege." Moreover, as the foregoing sentence indicates, only the visitor whose action caused the ultimate restriction of visiting privileges is entitled to notice. The regulations nowhere provide for notice to all persons on the visiting list whenever their privileges are suspended for reasons other than their own actions, and as noted earlier, these visitors have no independent right to notice.

It is undisputed in this case that the required notice was given. The official court file contains letters from the defendant Keller to each of the visitors whose visit resulted in the termination of their privilege advising them of this "action". Accordingly the state has not violated its established procedures and there has been no denial of due process.

For the reasons stated hereinabove, it is this 29th day of August, 1977, by the United States District Court for the District of Maryland, ORDERED:

That defendant's motion for summary judgment be, and the same hereby is, GRANTED;

That the plaintiffs' motion for partial summary judgment be, and the same hereby is, DENIED; and

That the classes shall be those which were conditionally certified.

Judgment to be entered accordingly.